IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

JUN 11 2019 *AM*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| SUPPRESSED, | ) | |
| | ) | |
| Plaintiffs-Relators, | ) | Case No. 1:17-cv-09232 |
| | ) | |
| v. | ) | **FILED UNDER SEAL PURSUANT** |
| | ) | **TO 31 U.S.C. §3730** |
| SUPPRESSED, | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| Defendant. | ) | **DO NOT ENTER ON PACER** |
| | ) | |
| | ) | **DEMAND FOR JURY** |

## **FIRST AMENDED *QUI TAM* COMPLAINT**

James F. Barger, Jr.
J. Elliott Walthall
Benjamin P. Bucy
Frohsin Barger & Walthall
100 Main St.
Saint Simons Island, GA 31522
205.933.4006

Deanna Pihos
dpihos@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170

Attorneys for Plaintiffs-Relators

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MIRANDA ATWOOD, THERESE BURKE, EARNESTA DEARMAN, and JAYMIE JARMAN, | ) ) ) ) ) | |
| Plaintiffs-Relators, | ) ) | Case No. 1:17-cv-09232 |
| v. | ) ) | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730** |
| AMEDISYS, INC., | ) ) | |
| Defendant. | ) ) | **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |
| | ) ) | **DEMAND FOR JURY** |

## FIRST AMENDED *QUI TAM* COMPLAINT

Relators Miranda Atwood, Therese Burke, Earnesta Dearman, and Jaymie Jarman, on behalf of themselves and the United States of America, allege and claim against Defendant Amedisys, Inc. ("Amedisys"), as follows:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331. Jurisdiction is also authorized under 31 U.S.C. §3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. §3732(a), because Defendant qualifies to do business in the State of Illinois, transacts substantial business in the State of Illinois, transacts substantial business in this judicial District, and can be found here. Furthermore, Defendant committed within this judicial District acts proscribed by 31 U.S.C.

§3729, to-wit: Defendant submitted to the United States false claims for payment for home health services that were never performed; were provided to ineligible, non-homebound patients; or were unnecessary and improper; and made or used false records material to such false claims.

## PARTIES

3.     Amedisys is a Baton Rouge, Louisiana-based corporation engaged in the business of providing home health and hospice services. Amedisys has service locations in 45 states and Puerto Rico. In 2014, Amedisys, whose billing practices had been publicly scrutinized by *The Wall Street Journal*[1] and the Senate Finance Committee,[2] among others, paid $150 million to resolve allegations that the company had submitted false claims to the Medicare program. The False Claims Act actions encompassed by the settlement alleged, *inter alia*, that Amedisys manipulated patient assessment data, billed for unnecessary therapy services, and admitted ineligible, non-homebound patients to the Medicare home health benefit.[3] As part of the settlement process, Amedisys entered into a corporate integrity agreement ("CIA") with the Department of Health and Human Services. As set out in this Complaint, however, Amedisys' short-lived focus on compliance in the wake of the 2014 settlement cut into profits and was quickly abandoned by corporate leadership. Since at least mid-2016, Amedisys and its management have once again adopted practices designed to result in higher corporate profits through the submission of false claims to the Medicare program.

---

[1] *See, e.g., Home Care Yields Medicare Bounty*, THE WALL STREET JOURNAL, April 26, 2010, *available at* https://www.wsj.com/articles/SB10001424052748703625304575116040870004462

[2] *See, e.g., Senate Investigating Amedisys*, THE WALL STREET JOURNAL, May 13, 2010, *available at* https://www.wsj.com/articles/SB10001424052748703339304575240633853462278

[3] https://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations

4.     Relator Therese Burke has over 15 years' experience as a health care manager and over 10 years' experience as a home health care executive. In 2013, she was hired by Amedisys as Area Vice President (AVP) of Operations for the Illinois, Wisconsin, and Indiana area. In 2016, Ms. Burke's Area received the Amedisys "Pod of the Year" award, given to the company's most successful unit. In that year, however, and as set forth in detail in this Complaint, Ms. Burke experienced an abrupt shift in company policy. Compliance efforts were marginalized, and Amedisys corporate leadership instead launched a series of campaigns designed to manipulate certain metrics that it determined could boost profitability. In pursuing these initiatives and demanding that quotas and metrics be met at a micro level and even on a daily basis, Amedisys executive officers steadfastly ignored practical considerations of patient case mix and even normal variance in the types of patients who might be admitted to or discharged from a given agency over a given day or week. By simply demanding that goals be met in every location at all times and savagely berating and threatening any manager whose agency or area failed to comply, Amedisys corporate leadership successfully conveyed the message that these quotas simply had to be maintained, regardless of actual patient care needs, clinical propriety, or qualification for the home health care benefit. Relator Burke repeatedly communicated to corporate leadership that she was concerned that these practices were not in compliance with Medicare regulations that were material conditions of payment for home health services, but she was rebuffed. In April 2017, as described in full detail in this complaint, Amedisys illegally terminated Relator Burke because of her efforts to prevent Amedisys' violations of the False Claims Act.

5.     Relator Miranda Atwood is a Registered Nurse with over 12 years' experience. Ms. Atwood was hired by Amedisys as a field nurse and was later promoted to Clinical Manager of

its Collins, Mississippi agency in November, 2006 and served in that capacity for over ten years, until October, 2016. In her capacity as Clinical Manager, Ms. Atwood observed the same evolution in corporate policy as Relator Burke. In or around early or mid-2015, company leadership (including the Area Vice-President for Mississippi) changed, and an intense focus began to be placed on daily and monthly admission and census levels. Amedisys put clinicians under enormous pressure to admit and retain patients, regardless of their eligibility and many non-homebound or otherwise non-qualifying Medicare patients were admitted and recycled through Amedisys' home health rolls.

6. Relator Earnesta Dearman served as a scheduler and, subsequently, as the Business Office Manager ("BOM") in Amedisys' Collins, Mississippi office for ten years, until her departure in October, 2016. Ms. Dearman witnessed the demands Amedisys' leadership placed on management, clinical, and marketing staff to see that patient admission and recertification quotas were met. In Relator Dearman's experience, these quotas were completely unreasonable in light of the low population density of the rural Collins, Mississippi area,[4] often leading Amedisys to "recycle" chronic patients who had no legitimate skilled need and did not qualify for Medicare home health care services.

7. Relator Jaymie Jarman served as BOM for Amedisys' Hattiesburg, Mississippi office from 2007 until March, 2016. Like her colleagues, Ms. Jarman witnessed Amedisys' practices of admitting, discharging, and readmitting chronic patients who had no legitimate home health need and often were not homebound.

---

[4] Collins is the county seat of rural Covington County, Mississippi with a population of around 2,500 people. *See* U.S. Census Bureau, "Geographic Identifiers: 2010 Geographic Profile Data (G001): Collins, Mississippi" available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last viewed Nov. 8, 2017).

8. Prior to filing this Complaint, Relators voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relators are the original source of the information for purposes of that Section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## MEDICARE HOME HEALTH COVERAGE

9. Through the Medicare program administered by Center for Medicare and Medicaid Services (CMS), the United States provides health insurance to eligible citizens. *See* 42 U.S.C. §§1395, *et. seq.* As part of its coverage, Medicare pays for some "home health services" for qualified patients. In order to qualify for home health care reimbursement under Medicare, a patient must: (1) be homebound -- *i.e.*, the patient is normally unable to leave her home, and doing so requires considerable and taxing effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). *See* 42 U.S.C. 1395(f). When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

10. It is the responsibility of the home health agency (HHA) to independently assess and verify whether a patient is homebound before it can bill and receive payment for home

health services from Medicare. 42 C.F.R. §484.55. By definition and default, a homebound patient must be unable to leave the home to receive federally-funded home health care; however, the Department of Health and Human Services (HHS) has issued guidelines recognizing a narrow exception, when a patient must leave the home under extraordinary circumstances allowing an HHA to nevertheless continue to receive federal reimbursement for home health services so long as the patient is otherwise homebound and only: (a) leaves the home infrequently; (b) for a short period of time; or (c) to receive medical treatment that cannot be provided in the home setting. *See* Medicare Benefit Policy Manual ("MBPM") ch. 7, §30.1.1. For an HHA to receive payment from Medicare, a beneficiary must actually be homebound, notwithstanding the existence of an otherwise valid certification of homebound status by a physician. *See e.g. U.S., ex rel., Prather v. Brookdale Senior Living Communities, Inc.,* No. 3:12-CV-00764, 2015 WL 1509211, at *4 (M.D.Tenn. Mar. 31, 2015) (in addition to the physician's certification, "[m]edicare also conditions payment on the beneficiary's actually being homebound and actually needing skilled services"). Direct observations of HHA staff are sufficient to put the HHA on notice that a patent is not actually homebound for purposes of meeting the conditions of payment from Medicare. *See Shmushkovich v. Home Bound Healthcare, Inc.*, No. 12 C 2924, 2015 WL 7251934, at *7 (N.D.Ill. Nov. 17, 2015).

11. Medicare pays for home health care by way of a Prospective Payment System (PPS). *See* 42 C.F.R. §484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. Accordingly, a registered nurse must evaluate the patient's eligibility

6

for Medicare home health care, including homebound status, and must determine the patient's care needs using the Outcome and Assessment Set (OASIS) instrument. The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service). Based upon the OASIS information -- and in turn upon the expected cost of caring for the patient -- the patient's "case mix assignment" is determined and the patient is assigned to one of eighty Home Health Resource Groups (HHRGs). The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by Medicare to determine the rate of payment to the HHA for a given patient.

12.    Once the HHA has submitted the patient's OASIS information, partial payment is made based on a presumptive a 60-day episode. To continue receiving covered care for another 60-day episode, the patient must be re-certified by a physician within the final five days of the initial episode as requiring and qualifying for home health care, and a new comprehensive assessment must be performed by the HHA recording the HHA's independent assessment that the patient is actually homebound and continues to require skilled services. The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed. Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition, homebound status, and the health services performed.

13.    According to a current report by the Inspector General for HHS, "[t]he Medicare home health benefit has long been recognized as a program area prone to fraud." HHS, Office of Inspector    General,    "OIG    Online    Portfolio:    Home    Health"    *available    at*

https://oig.hhs.gov/reports-and-publications/portfolio/home-health/ (last viewed April 22, 2019).[5]

Medicare home health fraud has steadily increased over time, shows no sign of abating, and becomes an ever more dangerous threat to the fiscal integrity[6] of the Medicare system as Medicare home health payments continue to rise. Taxpayers paid over $18 billion to home health agencies through Medicare in 2015. HHS, Office of the Inspector General, "Nationwide Analysis of Common Characteristics in OIG Home Health Fraud Cases" (June 2016) *available at* https://oig.hhs.gov/oei/reports/oei-05-16-00031.pdf (last viewed April 22, 2019). More than half of those payments -- over $10 billion -- were the result of fraud. Even while corporate raiders steal more than $10 billion annually from taxpayers through fraudulent, wasteful, and abusive home health billing schemes, the best efforts of the government recover less than $250 million each year. *Id.* (citing 350 criminal and civil actions and just $975 million in investigative receivables for the four years between 2011 and 2015, while estimating more than $10 billion in improper payments in fiscal year 2015 alone). Accordingly, less than 3% of all Medicare home health fraud is discovered by the government, as the Medicare system itself teeters on the verge of brink of bankruptcy. The hopelessly compromised Medicare home health program -- designed to benefit the most vulnerable of Americans, elderly shut-ins requiring skilled medical

---

[5] One of the earliest and largest home health fraud prosecutions dates back 30 years and involved many of the same general types of allegations in the instant action, regarding the largest nationwide home health company at the time, ABC Home Health. *See* U.S. GAO, "Allegations Against ABC Home Health" (July 1995) *available at* http://www.gao.gov/assets/230/221482.pdf (last viewed Nov. 8, 2017); AHC Media, "Mills May Be in Prison, But He's Still Free to Talk" (September 1, 1997) *available at* https://www.ahcmedia.com/articles/38137-mills-may-be-in-prison-but-he-s-still-free-to-talk (last viewed Nov. 8, 2017).

[6] Trustees for the Hospital Insurance Trust Fund (which accounts for Medicare income and disbursements) estimate that Medicare's asset reserves will be fully depleted in the next 12 years if the current rates of spending and fraud remain. *See* Soc. Sec. & Medicare Bds. Of Tr., Status of the Social Security and Medicare Programs: A Summary of the 2014 Annual Reports 1 (2014); for a brief discussion of the "dire straits" of Medicare and the Hospital Insurance Trust Fund, see James F. Barger, Jr., *Life, Death, and Medicare Fraud*, 53 Am. Crim. L. Rev. 1, 17-18 (2016).

care to survive -- has been for decades and continues to be the easy target of fraud by unrepentant, recidivist[7] corporations like Amedisys.

14. As referenced above, Amedisys was required to enter into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the Department of Health and Human Services (HHS-OIG) as a condition of its 2014 False Claims Act settlement agreement. The effective date of this CIA is April 22, 2014, and it imposes compliance obligations upon Amedisys for a period of five years. In addition to requiring Amedisys to establish and maintain a robust Compliance Program, the CIA also imposes discrete obligations when Amedisys learns of certain occurrences. One such provision regarding "Overpayments" states: "[i]f, at any time, Amedisys identifies or learns of any 'Overpayment' (defined as Amedisys having received money for home health services in excess of the amount due and payable), Amedisys shall repay the Overpayment to the appropriate payor (e.g., Medicare contractor) within 60 days after identification of the Overpayment and take remedial steps within 90 days after identification... to correct the problem, including preventing the underlying problem and the Overpayment from recurring."[8] Amedisys must also promptly notify HHS-OIG of "Reportable Events" -- which includes: "a substantial Overpayment" and "a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized."[9] Additionally, Amedisys must

---

[7] The rate of recidivism among corporations that committed the nation's most serious frauds is over 50 percent -- "about the same as robbery and firearms offenders and far higher than drug traffickers." Branden L. Garrett, *Too Big to Jail: How Prosecutors Compromise With Corporations* at 179 (2014) .

[8] Part III, Section I. Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Amedisys, Inc. and Amedisys Holding LLC (April 22, 2014).

[9] Part III, Section J. Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Amedisys, Inc. and Amedisys Holding LLC. (April 22, 2014).

submit an Annual Report that includes, *inter alia*, a summary of all Reportable Events and Overpayments.[10] Each Annual Report must include a certification that Amedisys is in compliance with its obligations under the CIA and Settlement Agreement and that the Annual Report is accurate and truthful.[11] As the facts alleged in this Complaint demonstrate, Amedisys' corporate policies -- developed while subject to the CIA -- encourage and cause the submission of false claims for home health care. As such, Amedisys, through its conduct, is making a mockery of the leniency afforded by self-monitored compliance agreement by continuously failing to comply with the CIA and materially breaching the CIA.

## DEFENDANT'S FALSE CLAIMS ACT VIOLATIONS

15. Amedisys knowingly submitted false claims to Medicare and false records material to such claims, as follows:

**I.     Amedisys has formulated corporate policy at the highest level
that results in the knowing submission of false claims.**

16. In the years leading up to the 2014 Settlement and the investigation that precipitated it, home health care industry insiders and sophisticated observers suspected that the nation's major home health care providers were "gaming" the Medicare payment system.[12] Amedisys, in particular, was singled out by both analysts and whistleblowers with inside corporate knowledge

---

[10] Part V, Section B. Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Amedisys, Inc. and Amedisys Holding LLC (April 22, 2014).

[11] Part V, Section C. Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Amedisys, Inc. and Amedisys Holding LLC (April 22, 2014).

[12] *See, e.g., Home Care Yields Medicare Bounty*, THE WALL STREET JOURNAL, April 26, 2010, *available at* https://www.wsj.com/articles/SB10001424052748703625304575116040870004462

for its highly problematic systems and practices.[13]  One observer described Amedisys' methods of record-keeping and billing, including its proprietary software, as a "secret sauce"[14] that enabled it to squeeze an artificially high profit margin from Medicare; in other words, Amedisys' financial performance was not in line with reality, absent fraudulent billing.

17.  Naturally, once Amedisys' billing practices came under the scrutiny of federal investigation, and it was forced shelve the "secret sauce," Amedisys' financial performance dropped significantly.  Even following the settlement, growth has been stagnant and Amedisys' net revenue and earnings remain well below 2012 levels.  In reaction to this problem, Amedisys leadership decided to abandon compliance and to look once more towards illicit means of boosting performance.  As described below, Relators have first-hand experience of this emphatic change in corporate policy and the resulting false claims to the Government.

**A.    Amedisys' financial performance cratered, then stagnated, under scrutiny.**

18.  As described above, in or around 2010, various outlets highlighted Amedisys' billing practices as indicative of misconduct.  Beginning in that year and up to the 2014 settlement, Amedisys and its Medicare billing history came under intense, public scrutiny in the form of Civil Investigative Demands from the Department of Health and Human Services, notices of investigation by the Securities and Exchange Commission, document requests and condemnatory reports by the Senate Finance Committee, and so on.

19.  Unsurprisingly, under this spotlight Amedisys' financial performance -- previously buoyed by its fraudulent billings -- withered.  In 2011, Amedisys announced net service revenue from its home health division operations of approximately $1.25 billion, compared to $1.462 billion in 2010 -- a decrease of 14.5%.  In 2012, net service revenue from the home health

---

[13] *See, e.g.,* http://www.citronresearch.com/seeking-healthy-returns-in-amedisys-nasdaqamed/

[14] *Id.*

division was $1.152 billion. In 2013, Amedisys announced net home health service revenue of $987.7 million, a decrease of 14.2% over 2012. In 2014, home health revenue was $956.9 million -- again lower. In sum, home health service revenue dropped 34.5% from 2010 to 2014. In 2015, Amedisys' home health revenue increased for the first time in four years, showing $1.005 billion in net home health service revenue for that year -- a modest 5% increase, but still well below 2010 levels. Then, in March 2017, Amedisys published its 10-K Annual Report for 2016, showing home health service revenue rising again to $1.085 billion, roughly an 8% increase over 2015 revenue.

20. Following the 2014 Settlement, and without the "secret sauce," growth remained stagnant. Moreover, at an Amedisys leadership conference in Virginia in Spring, 2013, Amedisys CEO Paul Kusserow informed management -- including Relator Therese Burke -- that in his estimation there "may only be five years of non-managed Medicare remaining" and that the company should "get what it could now." Amedisys leadership, convinced that the Medicare home health gravy train might be pulling into the station permanently in the near future, concluded that new strategies were needed to boost profits. In April, 2016 -- the month after it published the 2015 yearly financial report -- Amedisys announced a "major shakeup" at the executive level, letting go of its general counsel and Chief Medical Officer and bringing in a new Chief Financial Officer, Chief Information Officer, Chief Strategy Officer, and -- among other changes -- appointing former insurance executive Dan McCoy as Chief Operating Officer.[15] Shortly thereafter, in May, 2016, Amedisys reported that Chief Compliance Officer Jeffrey Jeter would take 12 months' of paid leave effective July 31 of that year. Of course, he never returned. It was communicated to Ms. Burke through her colleagues and supervisors that the basis of Mr.

---

[15] *See, e.g., http://www.modernhealthcare.com/article/20150407/NEWS/150409910*

Jeter's effective termination was that "compliance had swung too far the other way and was inhibiting growth." Amedisys could no longer afford to follow the rules.

**B.  Amedisys needed new means of illicitly boosting profits.**

21.  Though in dire need of stimulating growth and profits by whatever means necessary, Amedisys could not simply return to the exact same practices that brought about the prior investigation and 2014 Settlement.  These were now either too easily identified by auditors and regulators -- including through the mechanisms of the Corporate Integrity Agreement to which Amedisys is still a party -- or had been foreclosed by changes in regulation.  Amedisys needed to identify new ways to cut costs and boost billings to Medicare.

22.  In the period following the 2014 Settlement, Amedisys decided to abandon its problematic, proprietary "Point of Care" software and switch to a third-party program popular in the industry called "Homecare Homebase" -- a decision that would have other repercussions, as outlined below.  Similarly, Amedisys abandoned -- at least for a period -- the system of Quality Care Coordinators who reviewed OASIS assessments and whose role was to screen those assessments for opportunities to fraudulently upcode.  Accordingly, and as follows, Amedisys corporate management sought new means to manipulate the Medicare payment system and increase profit.

**C.  Amedisys' scheme to hit its reimbursement "sweet spot" by mandating visit levels regardless of need.**

23.  By July, 2016, McCoy and Amedisys corporate management were rolling out plans to cut costs and boost corporate profit by any means necessary.  One of the key points of this plan was an aggressive focus on monitoring and mandating the number of nursing and therapy visits performed per episode.  By limiting expensive, unprofitable nursing visits (regardless of

whether the patient needed them) and requiring more profitable therapy visits (again, regardless of whether the patient needed them), Amedisys could limit costs and maximize profit.

24.     McCoy and the company leadership had determined that "clean skilled nursing visits" were money-drains.    These are skilled nursing visits that are not associated with an OASIS assessment or a recertification; a clean skilled nursing visit is every other visit during an episode in which a skilled nurse performs a healthcare service or intervention.    Amedisys determined that "clean skilled nursing visits" must be kept to a minimum -- no more than the five per 60-day episode necessary to avoid a partial episode or a Low Utilization Payment (LUPA). In other words, McCoy and Amedisys determined that, in order to profit more off each Medicare home health episode, Amedisys would provide less nursing care to each Medicare patient.    This policy was strictly and brutally advanced through layers of corporate pressure.    No excuse related to the actual care needs of patient populations was tolerated.    Amedisys made clear to its regional, Area, and agency-level managers that the number of skilled nursing visits a patient received was a matter of finance, not a matter of clinical necessity.

25.     By the same token, therapy visits were closely monitored, and corporate leadership pushed area and agency management to ensure that therapy utilization levels were maintained in their most profitable window.    It was communicated to Relator Burke by her Regional supervisors, and, in turn, to Relators Atwood, Dearman, and Jarman by their Area and agency leadership, that the "sweet spot" the company wished to see maintained was a home health episode including five skilled nursing visits and 14-17 therapy visits per episode, for a total of 19-22 visits per episode.    Past that point, reimbursement for further visits did not outweigh costs, and were thus prohibited by management.    Episodes of more than 24 total visits required special authorization.    In this way, Amedisys' payment claims to Medicare were based not on legitimate

clinical decisions and patient characteristics, but were dictated entirely by Amedisys' profit goals.

26. This focus on fraudulently manipulating Medicare billing, which was directly experienced by Relators, is also partially corroborated by Amedisys' public financial reports. In the Medicare Key Statistical Data Section of Amedisys' 2016 10K report, for example, Amedisys lists both average revenue per completed episode and visits per completed episode: $2,839 per completed episode and 17.5 visits per episode in 2016. This Key Statistical Data is not listed for Non-Medicare Patients, however. The disparity between the economic focus and, thus, patient care for Medicare as opposed to other patients was also evident in the admission quotas mandated to Amedisys staff: only Medicare patients count toward Amedisys' impracticable admission goals.

27. As Area Vice President (AVP) of Operations for Wisconsin, Illinois, and Indiana, Relator Burke personally observed the tactics of Amedisys leadership -- headed initially by McCoy -- in attempting to dictate to thousands of clinicians, through operational management, decisions about their patients' care plans in a manner calculated to cut Medically-necessary costs and increase corporate Medicare profits. First, Amedisys rolled out a system for tracking "clean skilled nursing visits" and therapy visits on the granular level. Then, it applied relentless pressure down the ladder to keep those metrics within the desired parameters.

28. In July, 2016, Relator Burke and the other AVPs of her Region were informed by regional management -- specifically Senior Vice President Greg Breems and Regional Vice President Melissa Adams -- that they would be required to participate in corporate-level calls known as Clinical Effective Initiative (CEI) calls to discuss company performance. This itself was a break in protocol; formerly, regional leadership passed down direction to the Area level

from national leadership. Breems and Adams told Relator Burke and her AVP colleagues across the nation, "we're going to let you feel the heat we feel [from corporate leadership]." In a call on July 16, 2016, Chief Operating Officer (COO) McCoy informed Relator Burke and every other AVP that "the company had missed Wall Street expectations" and performance must improve.

29. In 2015, Amedisys transitioned -- at a purported cost of over $17M -- to a new medical record software known as "Homecare Homebase." One thing this software allowed the company to do was track patient census, visit, and other metrics on a granular level in real time. COO McCoy and other leadership began to use this capability to berate Area leadership for failing to maintain the mandated nursing and therapy visit goals weekly and even daily. First, goals and quotas were set on the corporate level. Then, AVPs were made aware of their performance goals and metrics by regional leadership. Next, they were required to participate in CEI calls on which they were excoriated by the COO himself if they failed to ensure that these metrics were met by the week or even the day. When individual care centers failed to meet quotas, Relator Burke and the Director of Operations of the particular agency in question were forced to participate in weekly "naughty calls" where quota performance was further emphasized. In that manner, corporate pressure was pushed from the very top, nationwide down to the regional and local level.

30. This shift in Amedisys' corporate-level directed fraud and the software tools to implement such strategies is noteworthy to viewing Amedisys' reaction and adjustment to the scrutiny that accompanied the 2014 settlement. Previously, Amedisys had utilized its "Point of Care" software and Quality Care Coordinators to upcode and boost revenue on a "behind the scenes," nearly automated, basis. Such programmed fraud was now suspected, and Amedisys was forced to adjust. Therefore, Amedisys unearthed its fraud from the backstage of software

and remote employees and forced front-line employees to "do the dirty work." This shift was implemented by the corporate monitoring of minute clinical details of a per-agency and per-patient basis through the Homecare Homebase software. Armed with this type of real-time data, Amedisys senior leadership -- led by Dan McCoy and later Chris Gerrard and Teonie Aurelio -- used any means necessary to force mid-level management like Relator Burke to meet their pre-determined outcomes set to maximize profitability. This unrelenting pressure was thus forced down the corporate structure to front-line management, such as Relator Atwood and fellow Clinical Manager Teresa Craft, and onto clinical personnel, like Licensed Practicing Nurses (LPNs) Allison Boleware and Jamie Byrd, visiting Medicare beneficiaries in their homes. Essentially, Amedisys recognized that a pre-ordained structure of fraud and upcoding is easily detected by nationwide investigations, but conveying to masses of employees that they must "find a way to make the numbers work" is a much more diffuse and complex scheme to forensically detect.

31.     The pressure to maintain visit levels as directed by company leadership was real, as were the repercussions for failing or refusing to do so. Relator Burke eventually was terminated, in violation of 31 U.S.C. 3730(h), by Amedisys for protesting and refusing to implement the policies described in this complaint. Relators are aware of numerous Amedisys managers who were terminated because they too protested or simply did not meet the unreasonable quotas and goals set and constantly monitored by Amedisys. No excuses were tolerated -- managers were given the option of either meeting targets through whatever means necessary or losing their jobs.

32.     The very fact that Amedisys' COO (a person with no formal clinical or medical training and no knowledge of the circumstances of specific patients) was tracking and reacting to patient care statistics on a daily or weekly basis demonstrates that Amedisys' goal was to force

patient care to conform to its revenue and cost goals, rather than the other way around. Manifestly, there is no way for an Amedisys agency Director or AVP to control the clinical status of patients who may be admitted on a given day or week. On some days, the company may admit patients who require more skilled nursing or therapy visits, on other days it may admit patients who require fewer. Every patient is different. Although it may be conceivable that, over the long term, the company might develop a strategy to market to certain types of patients, it would be totally impossible for managers to eliminate -- through legitimate means -- the kind of statistical "noise" present in the daily and weekly metrics that were the subject of McCoy's high-pressure calls. There is only one conclusion: Amedisys ordered managers to see to it that visit quotas were met and utilization was maintained in the "sweet spot," regardless of the type of patient admitted, the condition with which the patient presented, or the patient's actual care needs.

**D.    Amedisys' scheme to admit and recertify patient regardless of need or qualification.**

33.    Despite COO McCoy's dedication to fraudulently dictating the number of visits that could or had to be performed by clinicians in the field, his efforts were ultimately not drastic enough to meet Amedisys' unreasonably high Medicare profitability goals and, effective January 3, 2017, he was removed as COO. Home health industry insider Chris Gerrard replaced McCoy as Amedisys' COO, and he and his team brought a new emphasis designed to boost revenue: quotas for recertification of patients for further benefit periods. A higher recertification rate means higher census and higher revenue. To quote Gerrard's lieutenant and Amedisys' Home Health Division President Teonie Aurelio in her presentation to Amedisys management, described below: "recerts are the lowest hanging fruit."

34.   In March 2017, when Amedisys' February numbers were confirmed as not meeting expectations, Relator Burke and all company AVPs were summoned to a meeting in San Francisco, California.  Gerrard and Aurelia conducted this meeting in a now-familiar style of desperate anger:  they hammered the importance of meeting recertification quotas, reviewed each region and area performance in this regard, and publicly interrogated and humiliated any manager whose area or region fell short.  Many seasoned, experienced AVPs and Regional VPs were reduced to tears by the savagery of the interviews.  As a long-time home health manager, Relator Burke had never experienced this level of harassment in the name of corporate profit -- even during her pre-2014 tenure with Amedisys.  Gerrard and Aurelio made clear that "recert" quotas were to be met or managers would be fired and replaced by others who could achieve those goals.  In other words, Amedisys regional and Area-level management were to make sure that patients were kept on census for additional care episodes, regardless of patients' homebound status or care needs.

35.   One method advanced by Gerrard and Aurelia for pushing clinicians to recertify patients was for management to suggest that patients might be fatigued by multiple visits per week, and that, instead, the visits should be spread over multiple episodes.  A stroke patient might typically need and receive multiple physical, occupational, and speech therapy sessions per week -- if that patient were in a skilled nursing facility setting, for example.  Over a roughly eight-week (60-day) home health episode, however, even three therapy visits per week would add up to 24 therapy visits -- well outside the sweet spot.  Fabricating a pretext that three therapy visits per week might "fatigue" the patient, Aurelio and Amedisys told clinicians that they should stretch those visits over multiple episodes.  In that way, Amedisys could bill for two episodes in

the reimbursement sweet spot, rather than one episode in which "too many" visits were performed for optimal reimbursement.

36.    Of course, the opposite tack was taken when Amedisys' leadership deemed that an Area or agency was exhibiting therapy reimbursement *below* the ideal level.  At that point, managers -- like Relator Burke, who received this message from her Regional Vice President Greg Breems -- were told that their clinicians needed to be re-educated about the benefits that Amedisys' therapy visits could bestow on patients.  At a conference in Dallas in February, 2016, Home Health Division President Aurelio informed regional and Area managers that the average Amedisys patient is 83-years-old and asked "what 83-year-old cannot benefit from physical therapy?"

37.    In summary, Amedisys advocated to its management that, rather than be concerned about the limitations and requirements of the Medicare Home Health benefit, they should focus on the fact that many elderly people could potentially benefit from therapy services.  Thus, Amedisys suggested to its managers, they should feel good about pushing clinicians to perform therapy visits on any elderly patient up to the point where it was most profitable, at which point they should order clinicians to perform no more therapy, lest the patients become fatigued. According to Amedisys management, it was a miraculous and happy coincidence that profitable visits always "benefited" patients, while unprofitable visits always "fatigued" patients.  Once again, Amedisys' care decisions were dictated not by medical necessity, but by economic greed. At the above-described February, 2016, Amedisys management conference in Dallas, Texas, Relator Burke discussed with Amedisys Clinical Vice President Kit Hughes the policy of mandating patient admission and recertification quotas. Hughes vehemently expressed that she believed that the decision to recertify patients was a patient care decision to be left in the hands

of clinicians and that mandatory recertification levels -- together with pressure on agency management and clinicians -- invited fraud. Amedisys later terminated Vice President Hughes for expressing these views.

## II. Amedisys' policies result in false claims at the ground level.

38. Relators Atwood, Burke, Dearman, and Jarman have all observed and experienced the ways in which the corporate policies detailed above resulted in false claims by Amedisys for patients who were not homebound or otherwise did not qualify for the home health benefit; for therapy services that were unnecessary; and for Medicare PPS payments representing skilled nursing care that was withheld from patients who needed it.

### A. False claims for non-qualifying patients.

39. Inevitably, Amedisys corporate leadership's hyper-focus on Medicare census, admission, and readmission numbers -- pushed down through management via high-pressure tactics of intimidation and humiliation, as described above - led to the admission and retention of non-qualifying patients on Amedisys' home health rolls. In their various capacities as Amedisys employees, Relators directly observed how corporate pressure forced and continues to force Amedisys' Directors of Operations, Clinical Managers and, in turn, field clinicians, to admit and retain patients who are clearly not homebound or have chronic conditions which do not require skilled nursing or therapy intervention. In Mississippi in particular, Relators are familiar with several patients who -- for the sake of maintaining census and revenue goals -- have been regularly admitted, discharged, and readmitted for up to ten years. Although that practice has to some degree persisted during the Mississippi Relators' entire tenure with Amedisys, beginning in 2016 the increased pressure on admission and census quotas drove managers, marketers, and clinicians to go to even greater lengths to mine the limited potential patient pool in rural

Mississippi for chronically-ill patients who could be recycled through Amedisys' rolls, despite their lack of a legitimate skilled need.

40. In Amedisys' Collins, Mississippi location, where Relators Atwood and Dearman worked, and in Hattiesburg, where Relator Jarman worked, there were constant demands and ultimatums to maintain Medicare census and admission levels ramping up to the end of the month when quotas came due. This culture further deteriorated in 2016, after Dana Foreman became the AVP over Mississippi (in 2015) and came under pressure from corporate management (coinciding with the shift in corporate culture observed by Relator Burke at the same time).

41. Amedisys' clinical employees in Mississippi were reminded on a daily basis by operational management of the admission quotas (for Medicare patients only, never for patients with private insurance)[16] set by Amedisys' corporate leadership for each agency. These quotas were often wildly unrealistic, given the demographics of the rural Mississippi areas in which Relators worked and the market competition. As a result, Amedisys managers, marketers, and clinicians went to sometimes absurd lengths in attempting to satisfy corporate demands and thereby secure their employment.

42. Furthermore, Amedisys' past fraud continues to drive unrealistic admission goals and perpetuate the current and ongoing admission of ineligible Medicare home health patients. Amedisys formulates admission quotas on a Year over Year basis; that is, a particular month's admission quota is based on that month's admissions in the preceding year, plus an added multiplier raising the admission quota from the previous levels. For example, if 55 patients were admitted to the Collins office in July, 2011, roughly 60 new patients would be required in July, 2012, 65 patient would be required in July, 2013, and so on. This aggressive formulation --

---

[16] Admission of non-Medicare patients was actively discouraged.

which has no basis in patient care -- is especially problematic given that Amedisys' past performance was achieved through use of its "secret sauce," which resulted in a $150 million False Claims Act settlement. Relator Dearman is knowledgeable of the trajectory of monthly admission quotas over her ten-year career with Amedisys, and each year the monthly admissions mandated to the Collins office steadily increased, without any apparent accounting for those years when fraud was known to have been rampant. The current monthly quotas are thus founded in admission quotas established during a time period in which Amedisys is known to have widely defrauded Medicare -- leaving employees with no option but to resort to fraud in order to meet these quotas.

43. Amedisys' Directors of Operations in Collins, Laura Prince, and Hattiesburg, Michelle Johnson -- who were not only incentivized to meet admission quotas to maintain their position, but were also eligible for quarterly bonuses contingent on those quotas -- saw to it that patients were admitted regardless of their clinicians' assessments. When nurses performing initial assessments reported to Prince that patients were not homebound or did not qualify for home health care, she reminded them that "we need X number of admits" and admonished them to "get it done." When Relator Atwood approached Prince with concerns that the agency was admitting patients who were not appropriate, Prince told her that "this is what we have to do to hit budget" and asked, "Don't you want your bonus?" At times when patients were assessed as non-qualifying, Prince simply called the patient herself, conducted a brief phone interview, announced that the patient did qualify, and admitted the patient for billing to Medicare.

44. It was known by Amedisys marketers and clinicians that certain physicians were willing to refer patients for assessment by Amedisys with no regard to or even knowledge of the patients' conditions. For example, Dr. Burgese Turel in Laurel, Mississippi routinely referred a

high volume of patients to the Collins office for assessment under diagnoses such as "high cholesterol" -- often without any assessment of patients' past or present conditions. When Amedisys' Collins and Hattiesburg locations fell short of their patient budgets, marketers and clinicians were dispatched to obtain referrals from Dr. Turel. On one particular occasion in Autumn, 2015, Director Prince called Relator Atwood late in the evening and ordered her, as Clinical Manager, to telephone the on-call nurse, Ashton Watts, and inform her that a patient whom Dr. Turel had referred under a diagnosis of "hyperlipidemia" (high cholesterol) needed to be admitted that night because Amedisys operations in the State of Mississippi were one patient short of quota for the week.

45. In another example, Dr. Harpreet Sood, a physician associated with Covington County Hospital -- the primary health care entity in the Collins, Mississippi area -- was also willing to routinely disregard or not consider patients' actual condition and blindly refer patients to Amedisys for home health care. A contributing factor to Dr. Sood's unscrupulous referral practices was that his wife, Anjuman Sood, is the Account Executive (commonly referred as a "marketer" within Amedisys) for Amedisys' Collins, Mississippi office. Amedisys describes the Account Executive's role as "building and maintaining professional relationships with key referral sources," and "the Account Executive will be responsible for meeting the volume expectations for referrals & admissions; establishing and maintaining relationships with referral sources."[17] As the primary employee responsible for obtaining patient referrals, Anjuman Sood was under perhaps the most pressure of any employee to find a way to meet "volume expectations for referrals." To do so, she utilized the resources at her disposal -- her husband's patient population and his willingness to disregard patients' actual conditions in order to provide his wife with her needed referrals and admissions and corresponding bonuses. While she was

---

[17] https://amedisys.taleo.net/careersection/2/jobdetail.ftl?job=16001066 (last visited November 8, 2017)

required to meet Amedisys' referral expectations or lose her job, Anjuman Sood also received a significant amount of her total compensation -- between $5,000-$10,000 per quarter -- from bonuses tied to meeting referral goals. As described below, Relators Dearman and Atwood are aware of the audacious manner in which Anjuman Sood used her husband's medical license and access to a captive patient population to meet mandated productivity goals while reaping large bonuses.

46.     Because the extremely low population density of rural Mississippi could not legitimately sustain the admission numbers required by Amedisys at the corporate level, the agency leadership resorted to more drastic measures to meet quotas.  Relators estimate that, in Mississippi, only 10-15% of Amedisys' home health admissions were patients discharged from hospitals.  Instead, Director of Operations Laura Prince ordered marketers and clinicians -- with greater urgency as quotas became due -- to visit doctors' offices with lists of previously discharged patients and ask physicians or their staff for orders to reassess these patients for readmission to Amedisys' home health rolls.  In this manner, and as described in the patient examples below, Amedisys frequently recycled the same patients through its rolls for years, admitting them, discharging them, and then readmitting them.  In many of these cases, the patients had chronic conditions, had experienced no intervening health event, and had no legitimate skilled need.  Many were not homebound.  Many were very surprised when Amedisys nurses showed up to assess and admit them.

47.     Anjuman Sood -- the one of three Collins Account Executives and the only one solely dedicated to the Collins office -- habitually utilized management's instructions to print and highlight readmission patients from these previous discharge lists in order to meet mandated quotas. Relator Dearman routinely witnessed this process, which is illustrative of how the

Mississippi offices -- particularly Collins -- found ways to meet nationally set quotas despite the lack of new patients. A typical referral, order, and admission would consist of the following steps: Anjuman Sood would print out a previous Amedisys discharge list -- often forwarded to her as an attachment to a harassing email from AVP Dana Foreman; Ms. Sood would then use a highlighter to select patients' names, often under her husband's care, that she believed it might be feasible re-admit; next, she brought the list of patients to the referring physician (most often her husband), who would agree to order an assessment for the patients that his wife had highlighted; and she then returned with an order form with only the patients' names or often simply a list of names of patients to be assessed on a sticky note. Because the selection of these patients for home health care was solely at the discretion of Anjuman Sood -- who has no medical training or credentials -- there were no visit notes or any medical information from the referring physician accompanying the order form. In order to process these orders and produce the documentation required to send with billing to Medicare, Relator Dearman as BOM, and other office staff such as Judy Graves, resorted to combing through the selected patient's files, locating documentation from a previous home health episode, and copying the patient's identifying information and admitting diagnosis -- without any clinical input and from a potentially years-old prior home health service period to the new admission paperwork. After the admitting diagnosis and other admitting paperwork was fabricated, Amedisys office staff would then call the patient -- who had no idea they were to be re-admitted to home care -- to schedule a time for an Amedisys nurse to perform a pre-determined "initial assessment."

48. Amedisys' clinicians also were provided with incentives to see that Medicare patients were recertified. Many clinicians served on a per-visit contract basis and were well aware that their employment depended on maintaining census levels. Employees were let go

when admissions and census quotas were not met. When clinicians in Collins and Hattiesburg indicated that a patient should be discharged, they were told by management that the patient needed to be kept on service in order to protect that patient from the competition (i.e., other home health companies that might admit that patient in the future and deprive Amedisys of a patient to recycle through its rolls as part of its ongoing source of Medicare revenue). When asked by management and colleagues why some of her patients had been on service for long periods of time, LPN Allison Boulware was known to routinely respond, "I can't discharge this patient, because I have to have patients or I'll get fired." Additionally, when quotas were tight and more incentive was needed, Amedisys' Director of Operations Prince offered clinicians cash equivalent Visa gift cards in direct exchange for producing patient admissions.

49. Perhaps the starkest example of the means to which Amedisys' staff in Mississippi were forced to resort to satisfy corporate leadership, maintain census, and keep their jobs is the fact that a very large percentage of Amedisys employees had family members who were recruited onto the Amedisys rolls. Relators estimate that perhaps half of Amedisys employees in Hattiesburg had family for whom Amedisys billed Medicare at some point. For example, Relator Jaymie Jarman's mother and aunt were both Amedisys patients for a time and received therapy services that did not improve their conditions.

50. The following are representative examples of patients whom Amedisys admitted, and whose care Amedisys billed to the Medicare program, but who did not qualify for the Medicare home health benefit:

- Patient 1 was repeatedly admitted, discharged, and readmitted by Amedisys' Collins, Mississippi location over the course of some 10 years. Patient 1 was nearly always admitted with a primary home health diagnosis of Urinary Tract Infection, but had no legitimate skilled need. On at least two occasions, Patient 1 traveled out of state on vacation with her family. Patient 1 was not "normally unable to leave her home" and could leave it without

"considerable and taxing effort"; Patient 1 was therefore not homebound. Nonetheless, at the direction of Amedisys and Collins Clinical Manager Theresa Craft, Patient 1 was consistently admitted for two Medicare home health benefit periods, discharged, and then later readmitted, for a decade, all resulting in false claims to the Medicare program.

- Patient 2 was another patient who Amedisys recycled through its rolls for 10 years or more. Based on the fact that she received a periodic B12 injection, Patient 2 was admitted by Amedisys under a diagnosis of "Pernicious Anemia," but actually had no such condition requiring skilled nursing care. In fact, Patient 2 had no skilled need. The service Patient 2 actually received from Amedisys Home Health Aide Ruth Burkhalter consisted primarily of having her hair braided -- hardly a skilled need by any medical standard. As of the time of this writing, Relators believe that Amedisys continues to admit, discharge, and readmit Patient 2 on a regular basis.

- Patient 3 was admitted, discharged, and readmitted to Amedisys' rolls in Collins, Mississippi for over two years and was on service when Relator Atwood left Amedisys in October 2016. Patient 3 was not homebound and he could and did frequently leave his home without considerable and taxing effort. Patient 3 regularly called the Amedisys office in an attempt to schedule his clinical visits, because he was so often away from home. Patient 3 was known by Amedisys employees frequently to drive other patients on routine errands (who themselves were billed as homebound even though they were not). Nonetheless, Patient 3 was repeatedly admitted by Amedisys and his care falsely billed to the United States.

- Patient 4 was admitted by Amedisys' Hattiesburg office for numerous home health care episodes between 2007 and 2015. Patient 4 was at times admitted under a diagnosis of "Vertigo," but at other times her diagnosis was listed as "random weakness and dizziness." Patient 4 had no legitimate skilled need, but received both skilled nursing visits and therapy visits as part of Amedisys' "Balanced for Life Program." In reality, however, Patient 4 could and did leave her home on a regular basis without considerable or taxing effort and for reasons unrelated to her medical care. Patient 4 was a relative of two Amedisys' employees that worked in both the Collins and Hattiesburg offices, Amber Ratcliff and Anna Elliott who regularly took Patient 4 shopping at the mall and on other frequent outings. Amedisys nurse Amanda McCoy was assigned to Patient 4 and was regularly heard to ask Ms. Ratcliff when Patient 4 might be home so that McCoy could perform a home health visit.

- Patient 5 was admitted by Amedisys' Hattiesburg office for at least three home health care episodes in 2015 under a diagnosis of multiple sclerosis. Amedisys nurse Lanna Wakeland was assigned to care for Patient 5 but could rarely do so because Patient 5 was rarely, if ever, at home at the time of her scheduled home health care visits. Several times a week while on

Medicare home health service, Patient 5 drove herself around the Hattiesburg area running errands including getting her hair done or going to play cards. Further, while on home health service, Patient 5 repeatedly traveled out of state from Hattiesburg, Mississippi to visit family members in Louisiana. As such, Patient 5 could and did leave her home on a regular basis without considerable or taxing effort and for reasons unrelated to her medical care.

**B.    False claims for unnecessary therapy services.**

51.    Not only did Amedisys' corporate strategies result in the admission of patients who did not qualify for home health care under the Medicare program, they also resulted in the provision of unnecessary therapy services performed solely to boost Amedisys' reimbursement. As a result of corporate pressure to keep therapy utilization within the reimbursement sweet spot -- including Amedisys' strategy of pressuring clinicians to space therapy out into multiple patient episodes -- patients often received therapy services well past the point when those patients could benefit from such services (as well as, in many cases, past the point when the patient had recovered from the injury or procedure that originally ostensibly necessitated care, and was no longer homebound). In the respective experiences of all four Relators, Amedisys' staff were well aware of the widespread provision of unnecessary therapy services.

52.    As AVP, Relator Burke was provided with weekly "therapy scorecards" for each care center she oversaw. These scorecards broke down therapy utilization into "therapy buckets" and set quotas for utilization of these buckets: 1-5 visits, 6-9 visits 10-13 visits, 14-19 visits, 20-23 visits and 24 or more visits. Ms. Burke's supervisors, Senior VP Greg Breems and Regional VP Melissa Adams, informed Ms. Burke that she was required to monitor these scorecards and applicable "bucket" goals and to run the Medicare Home Health Utilization Analysis Report, which would place the Area's therapy utilization into the context of cost and gross margin. Put otherwise, Amedisys' internal reports told Ms. Burke whether the performance of more or fewer

therapy visits per episode would result in higher reimbursement. If goals were not met, Breems and Adams told Relator Burke to "dig deeper;" that is, Ms. Burke's supervisors told her that she was expected and required to ensure that clinicians performed the most economically beneficial number of therapy visits as reflected by the scorecard and utilization reports. As described above, failure to achieve this goal was met first with intimidation and discipline, then ultimately by termination.

53. In Ms. Burke's view and in the view of her agency-level managers -- as well as many of her colleagues -- these policies were a means of coercing management into ensuring that certain levels of utilization were maintained, regardless of patient need. In other words, Amedisys' corporate policy was designed to result in claims for clinically unnecessary therapy. Ms. Burke's Area of Wisconsin, Illinois, and Indiana encompassed agencies with different types of patient populations who were treated by Amedisys clinicians in varied care environments. As with the untenable admission quotas mandated upon the rural Mississippi office discussed above, each care centers' area has different demographics and different patient needs and nationally set requirements are inapt in different ways, often specific to that location. Therefore, Amedisys' corporate dictated requirements were forcing heterogeneous patient populations into a profitability driven one-size-fits all care plan -- a square peg into a round hole. The only way to "make it work" was through disregarding the Medicare home health patient requirements. Many agency-level managers to whom Ms. Burke spoke during 2016 and 2017 told her that it as simply impractical to meet Amedisys' utilization requirements at all times given the patient population and the natural fluctuation in the type of patients admitted. Many of these Amedisys' employees told Ms. Burke, however, that this impossible requirement must be met for them to keep their jobs.

54. Relators Atwood, Dearman, and Jarman also observed the results of Amedisys' push for optimal therapy utilization from their vantage point in Mississippi. In general, in the Relators' experience, therapy tended to be over utilized in Mississippi for the practical reason that the potential patient population was low and all therapists were paid per visit. Therapists were thus incentivized to perform more visits and were encouraged to do so by operational managers such as Director of Operations Laura Prince, who reprimanded Relator (and Clinical Manager) Atwood for questioning high-volume therapists. As described above, many chronic patients who did not qualify for the home health benefit received a high volume of therapy visits. Increasingly after 2015, when Dana Foreman took over as Area Vice President for Operations, therapy utilization goals were pushed down to staff via the agency Director of Operations Laura Prince. Prince educated staff on therapy "buckets" and informed them of utilization goals -- of 16 to 24 visits per episode -- set by corporate leadership to maximize profitability. Prince and other Amedisys managers informed clinical staff in Mississippi that plans of care including more than 22 visits per episode were discouraged and subject to additional approval from the Area Vice President, Dana Foreman. From the perspective of clinical staff in Mississippi, this dictate endangered patients such as those who had suffered from stroke, whose progress might depend on a higher volume of therapy visits, particularly at the beginning of their recovery.

55. One example of Amedisys' corporate push to hit the "sweet spot" of visits was the limited care provided to Patient 6, a patient in the Collins, Mississippi agency. Patient 6 was admitted to home care with a stroke diagnosis and due to her severe condition required substantial care, including therapy visits to regain her motor skills. Relator Atwood was the Amedisys Clinical Manager assigned to Patient 6. Upon comprehensive assessment required by Medicare regulations, nurse Jennifer Aylesworth and therapist Jason Mooney recommended that

Patient 6 receive substantial therapy services based on her post-stroke condition. However, because Patient 6 was referred to Amedisys after Corporate leadership's initiative to limit therapy visits to those in the "sweet spot," Relator Atwood had to receive approval from Area Vice President Dana Foreman to provide Patient 6 the necessary therapy. Ms. Foreman denied the requested therapy visits and limited Patient 6's care to only 22 therapy visits in order to remain within corporate leadership's "sweet spot" for maximum Medicare profitability. Relator Atwood vehemently disagreed with this decision and voiced such concerns to Ms. Foreman, yet was argumentatively and soundly overruled. Therefore, despite having recently suffered a stroke, Patient 6 was denied the care that Amedisys' own clinical staff determined to be necessary to manage her condition based on an edict set by national level management in order to fraudulently increase the company's Medicare profits and bolster the company's stock price. As a dedicated health care provider Relator Atwood was deeply affected by seeing Patient 6 in need of care yet refused such care to meet corporate financial goals. This situation was one of the primary reasons causing her to voluntarily leave her employment with Amedisys and ultimately come forward to report Amedisys' fraud.

56. In some instances, Amedisys' billing for unnecessary therapy visits became even more blatant. Relators are aware of several situations in which Amedisys therapists forged documentation reflecting patient visits that were never performed, as well as therapists performing very brief, perfunctory patient visits without providing legitimate therapy services. Amedisys management was made aware of these situations but, to Relators knowledge, did nothing to correct the amounts paid by Medicare for these fraudulent visits.

57. For example, in 2016, in the performance of her duties as Business Office Manager, Relator Dearman noticed inconsistencies in patient signatures confirming visits performed by

Amedisys therapist, Dana Hancock. Relator Dearman investigated by telephoning the patients concerned, at least two of whom denied that they had received a visit from Ms. Hancock. Relator Dearman reported this to Director Laura Prince, who promised to investigate but apparently did nothing. It was well known among Amedisys staff in Collins, Mississippi that therapist Hancock routinely performed very short patient visits of only a few minutes. Speech Therapist Carolyn Ford reported that she visited a patient whom Dana Hancock represented to be visiting around the same time, and observed that Hancock recorded a 30 minute visit when she could not have been in the home for a more than a few minutes.

58. Relator Dearman also reported many of these problems to Amedisys Corporate employee Connie Daniels. Ms. Daniels, a high-level corporate officer based in St. Marks, Florida, was employed in an auditor capacity with Amedisys and visited the Collins office to perform a 100% probe audit in the 2010-2011 timeframe (during the time that the Department of Justice was investigating Amedisys for the alleged fraud that resulted in the 2014 settlement). The result of Ms. Daniels' audit was roughly half of the Collins office's patients at that time were discharged as inappropriate. Thereafter, Relator Dearman remained close with Ms. Daniels and informed her of the more recent problems spurred by the resurgence of corporate pressure and fraud beginning in 2016. In late September or early October 2016, Relator Dearman informed Ms. Daniels -- by way of the Amedisys corporate Instant Messenger system -- of the rampant discharge/re-admit fraud that permeated the Collins office patient rolls and Director of Operations Laura Prince's encouragement of this practice. In response, Ms. Daniels acknowledged the validity of Relator Dearman's concerns and confided: "this is going on everywhere." In other words, one of the company's key auditors who worked to address Amedisys' prior conduct that resulted in a record $150 million Medicare fraud settlement and a

Corporate Integrity Agreement with HHS, tacitly acknowledged that Amedisys is back to defrauding Medicare again nationwide.

59.     As described herein, Amedisys has systematically and knowingly submitted false claims to the Medicare program and created and used false records material to those claims.

**III.    Amedisys' Retaliation Against Relator Burke in Violation of 31 U.S.C. § 3730(h).**

60.     Despite outstanding performance, numerous commendations, and regular plaudits from company leadership recognizing her as one of the company's top managers, Amedisys abruptly and illegally terminated Relator Burke in April, 2017 because on numerous occasions she reported to her superiors that Amedisys' corporate dictates of patient care decisions were inappropriate and non-compliant with Medicare requirements and because Relator Burke refused to participate in Amedisys' fraud.

61.     After hiring Therese Burke in 2013 as Area Vice President of Sales for the Great Lakes "Pod," Amedisys quickly promoted her to General Manager in 2014, putting her in charge of Sales, Operations, and Clinical divisions for the region. Ms. Burke proceeded to significantly improve performance, winning "Most Improved Pod" and receiving an award from Vice President of Operations Matt Morgan. Ms. Burke was asked to precept new AVPs and travel to poorly performing agencies as a trouble-shooter. In short, Amedisys clearly viewed Ms. Burke as a star manager.

62.     As described above, however, Amedisys corporate leadership was displeased with the company's overall 2015 performance, and the behavior (and soon, identity) of senior leadership began to change. Relator Burke's region was restructured and she became Area Vice President of Operations. Amedisys named Melissa Adams Vice President of Operations (and

thus, Ms. Burke's director supervisor) and Greg Breems Vice President of Operations for Amedisys' West Region. Kit Hughes became Vice President of Clinical.

63. As more fully described above, it was at this time that senior leadership implemented mechanisms, such as the Clinical Effective Initiative calls, designed to pressure managers at the area and agency levels to achieve performance goals (such as clean skilled nursing visits and recertifications) on a day-to-day basis. These unrealistic requirements could only practically be met through fraud, specifically, violations of the False Claims Act (*i.e.*, billing for home health services that were never performed; were provided to ineligible, non-homebound patients; or were unnecessary and improper).

64. Around July 2016, Ms. Burke discussed the impropriety of these tactics with VP Adams. Adams told Burke that, while she agreed that the CEI calls were "horrible" and it was "impossible" to manage these numbers in the way Amedisys was demanding, Adams needed the job (and therefore had no choice but to bow to the corporate will). In effect, Adams conveyed to Relator Burke that, unless she wanted to be fired, she would have to find a way to produce impossible results.

65. In the fall of 2016, Relator Burke had a conversation with Clinical Vice President Kit Hughes about the illegality and impropriety of Amedisys setting quotas and budgeting for recertifications. Given that recertification decisions should be driven solely by patients' clinical outcomes and needs, Relator Burke was concerned that mandating recertification levels was, in practice, a requirement that patients be recertified as requiring and qualifying for the Medicare Home Health benefit regardless of medical necessity. Amedisys' VP of Clinical agreed with Relator Burke, telling her that she found the practice "ridiculous and unethical" and had never seen it employed in all her experience in home health. When Relator Burke passed this

information along to VP Adams, Adams told Ms. Burke to ignore VP Hughes, who was out of favor with senior leadership and could soon be dismissed herself.

66.     Relator Burke then saw Adams' threats materialize as other regional and area managers were fired for resisting Amedisys' fraudulent and unrelenting push to direct clinical decision making.   In the fall of 2016, Tina Coats, an Amedisys AVP of Operations in the Oklahoma region, was outspoken about her opposition to Amedisys' fraudulent and harmful policies.   Specifically, Ms. Coats informed Relator Burke, and other managers at Amedisys, that she believed Amedisys' pressure to direct clinical decision making was fraud and CMS should be alerted.   Relator Burke told Adams, her direct supervisor, what Ms. Coats had told her. Adams warned Relator Burke to "stay out of it if [Relator Burke] wanted to keep her job" and that she should not repeat anything Ms. Coats told her.   Soon after, Tina Coats was fired. Consequently, the message was clear: managers who questioned Amedisys' policies, discussed or even hinted that Amedisys was defrauding the government and harming patients would be summarily terminated.

67.     In early 2017, as described in detail above, new leadership arrived in the form of Chris Gerrard and Teoni Aurelio, who only increased pressure on area managers and agency directors to remain within mandated performance parameters at all time.   At this time, Relator Burke continued to be singled out as a top manager, receiving awards for highest "NIFO" (a method of calculating profit) and growth.   On January 19, 2017, VP Greg Breems sent an email to all AVPs acknowledging this accomplishment, writing "Fantastic Job Therese and Team." Nevertheless, Aurelio and Gerrard communicated to Ms. Burke and her colleagues that if they could not identify and implement the means to somehow manipulate clinical decisions so that their agencies met performance requirements, they would be fired.   It was clear to Ms. Burke

and, based on her conversations with her fellow AVPs and with VP Adams, area and regional management as a whole, that it was simply impossible to achieve that goal through legitimate methods. Amedisys was ordering its management to commit fraud.

68.    In March 2017, VP Adams told Relator Burke that the Lake Zurich, Illinois care center, which was under Relator Burke's supervision, was underperforming and that, if it did not start "hitting its numbers," Ms. Burke would be fired. Specifically, Lake Zurich was not maintaining the recertification rates and targets that Amedisys leadership insisted upon. At the time, the Lake Zurich care center was roughly 35% short of Amedisys' wildly unrealistic recertification targets.

69.    Amedisys' Lake Zurich program, however, was almost entirely dependent on referrals from an assisted living facility. The program received almost no hospital-based referrals, and the patients in the facility were generally high-functioning. Simply put, the patients did not need to be recertified at the artificial rates demanded by Amedisys. Both Lake Zurich Director Ania Claude and the physical therapy staff insisted that patients were being recertified when appropriate and that Amedisys' quotas could not be met without false recertifications. Relator Burke agreed and suggested to VP Adams that Ms. Burke develop a strategy to broaden the program's referral base. Adams responded that "that's fine for the future, but you need to hit the numbers now."

70.    To immediately cure a 35% deficiency in the recertification target would require dozens of false recertifications and result in the submission of false claims for payment in violation of 31 U.S.C. § 3729 because the Lake Zurich patients being falsely recertified would not meet the criteria required to receive the Medicare Home Health benefit. Ms. Claude refused to oversee such fraud and maintained the Lake Zurich care center would recertify patients when

37

it was medically necessary to do so. In response, Adams ordered Relator Burke to fire Ms. Claude and install someone who would accomplish Amedisys' fraudulent goals. In other words, Adams ordered Relator Burke to fire a director who was appropriately caring for patients and appoint one who would see that patients were recertified inappropriately.

71.     Relator Burke refused to fire Ms. Claude and actively participate in Amedisys' fraud, which was enforced and directed through intimidation and termination of unwilling participants. By doing so, Relator Burke knew that, like Tina Coats a few months prior, her termination was likely forthcoming because she had not only discussed concerns about Amedisys' practices with other managers despite warnings not to do so, but now she had defied a direct order to perpetuate Amedisys' fraud.

72.     Shortly thereafter, in April 2017, in violation of 31 U.S.C. 3730(h), Amedisys, through VP Adams fired Relator Burke for preventing false claims from being submitted by refusing to accede to its demands that she participate in its fraud against the Medicare program.

**COUNT ONE**
**PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS**
**UNDER 31 U.S.C. §3729**

73.     Relators adopt and incorporate paragraphs 1-72 as though fully set forth herein.

74.     By and through the fraudulent schemes described herein, Defendant knowingly -- by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information -- presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

   a.     Defendant submitted false claims for home healthcare provided to patients whom Defendant knew or should have known were not homebound or did not require skilled care and did not meet Medicare or Medicaid requirements for home healthcare, in violation of, *inter alia*, 42 U.S.C. §1395f and 42 C.F.R. §484;

b. Defendant submitted false claims for home health care PPS payments that were fraudulently inflated by therapy services that were medically unnecessary to never performed;

c. Defendant submitted false claims for home health care PPS payments that were fraudulently inflated by false OASIS patient assessment data, in violation of, *inter alia*, 42 U.S.C. §1395f and 42 U.S.C. §484;

d. Defendant submitted false claims for home healthcare that Defendant never provided and did not intend to provide;

e. Defendant submitted false claims for home health services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

75. The United States paid the false claims described herein and summarized in the previous paragraph.

76. Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States.

77. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

### COUNT TWO
### MAKING OR USING FALSE STATEMENTS OR RECORDS
### MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. §3729

78. Relators adopt and incorporate paragraphs 1-72 as though fully set forth herein.

79.     By and through the fraudulent schemes described herein, Defendant knowingly --
by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of
the information -- made, used, or caused to be made or used, false records or statements material
to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United
States, to wit:

a.     Defendant made and used false records reflecting nursing and therapy visits
that were not medically necessary, did not qualify as skilled services, or
were rendered to patients who did not qualify under the Medicare home
health benefit, all in violation of 42 U.S.C. §1395y(a)(1)(A) and the
Medicare regulations cited *supra*;

b.     Defendant made and used false patient assessment data that inaccurately
reflected patient conditions or falsely emphasized conditions that were not
part of the patients' legitimate home health needs;

c.     Defendant made and used false clinical documentation, including plans of
care, designed to reflect that it was properly treating Medicare patients'
conditions under a legitimate plan of care, when in fact Defendant was
withholding care that those Medicare patients needed in order to cut losses
and boost its profits;

d.     Defendant made and used false CMS Forms 1450 that reflected fraudulently
inflated OASIS scores and were intended to -- and did -- elicit fraudulently
inflated home health PPS payments;

e.     Defendant made and used false CMS Forms 1450 and 855A and other false
certifications regarding past, present, or future compliance with a
prerequisite for payment or reimbursement by the United States through
Medicare or Medicaid when in fact Defendant intended to -- and did --
defraud the Medicare system by falsely claiming inflated home health PPS
payments.

80.     The false records or statements described herein were material to the false claims
submitted or caused to be submitted by Defendant to the United States.

81.     In reliance upon Defendant's false statements and records, the United States paid
false claims submitted by Defendant that it would not have paid if not for those false statements
and records.

82. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Relators demands judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 3729(a)(1)(G)

83. Relators adopt and incorporate paragraphs 1-72 as though fully set forth herein.

84. By and through the fraudulent schemes described herein, Defendant knowingly -- by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information -- made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

  a. Defendant knew that it had received millions of dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

  b. Defendant knew that it had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, and by the provision of unnecessary services, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

  c. Defendant knew that it was in material violation of the terms of its Corporate Integrity Agreement and that, had the United States know of such

violation, Defendant would have been excluded from the Medicare program. Nevertheless, Defendant concealed its material violation and continued to submit false claims to the United States.

85. As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT FOUR
## MATERIAL BREACH OF CORPORATE
## INTEGRITY AGREEMENT AND
## FALSE CLAIMS UNDER 31 U.S.C. §3729

86. Relators adopt and incorporate paragraphs 1-72 as though fully set forth herein.

87. By and through the fraudulent and retaliatory schemes described herein, Defendant has materially breached the CIA. *See CIA Part X, Section D.* Such material breaches included repeated and/or flagrant violation of the obligations under the CIA and failure to report a Reportable Event, take corrective action, and make appropriate refunds as required by the CIA. *Id.*

88. According to the CIA, these material breaches of the CIA constitute an independent basis for Amedisys' exclusion from participation in the Federal health care programs. *Id.* As a result, Amedisys' continued submission of claims to the Medicare program is in violation of the False Claims Act, and its claims thus submitted are false or fraudulent.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of

Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT FIVE
## FAILURE TO COMPLY WITH CORPORATE
## INTEGRITY AGREEMENT

89. Relators adopt and incorporate paragraphs 1-72 as though fully set forth herein.

90. By and through the fraudulent and retaliatory schemes described herein, Defendant has failed to comply with certain obligations of the CIA that incur imposition of stipulated monetary penalties. *See Part X, Section A.* Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Services and Amedisys, Inc. and Amedisys Holding LLC. (April 22, 2014) (CIA). Such failure to comply includes failure to report Reportable Events and submission of false certifications by or on behalf of Defendant on required Annual Reports. *Id.*

91. As a result of Defendant's fraudulent conduct, Defendant is subject to stipulated penalties as provided by CIA Part X, Section A, including a Stipulated Penalty of $2,500 for failure to implement reporting of Reportable Events; a Stipulated Penalty of $50,000 for each false certification submitted by or on behalf of Amedisys as part of its Implementation Report or Annual Report and a Stipulated Penalty of $1,000 for each day Amedisys has failed to comply fully and adequately with any obligation of the CIA. *Id.*

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by as permitted by 31 U.S.C. 3730(c)(5), including attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT SIX
## RETALIATION UNDER 31 U.S.C. 3730(h)(1)

92.     Relator adopts and incorporates paragraphs 1-72 as though fully set forth herein.

93.     Defendant knowingly threatened, harassed, discriminated against and discharged Relator because of lawful acts done by the Relator in an effort to stop or prevent violations of the False Claims Act.

94.     As a result of Defendant's retaliatory conduct, Relator has suffered damages of extended periods of lost pay, irreparable harm to her personal and professional reputation, undue hardship forced upon Relator and her family, and extended infliction of emotional distress upon Relator and her family.

WHEREFORE, Relator demands judgment in her favor and against Defendant, in an amount of two times the amount of back-pay accrued since Relator's termination, interest on that back-pay, and compensation for special damages caused by Defendant's discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C. § 3730(h)(2).

Respectfully submitted,

/s/ James F. Barger Jr.
James F. Barger, Jr.
J. Elliott Walthall
Benjamin P. Bucy
One of the Attorneys for Relators

James F. Barger, Jr.
J. Elliott Walthall
Benjamin P. Bucy
Frohsin Barger & Walthall
100 Main St.
Saint Simons Island, GA 31522
205.933.4006

/s/ Deanna Pihos

One of the Attorneys for Relators

Deanna Pihos
dpihos@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170

## RELATORS DEMAND A TRIAL BY JURY

## CERTIFICATE OF SERVICE

The undersigned certifies that she caused a copy of the foregoing Complaint to be served upon the parties named below, this 11th day of June, 2019:

By Certified Mail, Return Receipt Requested:

The Honorable William Barr
Attorney General of the United States
U.S. Dept. of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0001

By Hand Delivery:

The Honorable John R. Lausch, Jr.
U.S. Attorney
Office of U.S. Attorney
Northern District of Illinois, Eastern Division
219 S. Dearborn St., 5th Fl.
Chicago, IL 60604

/s/ Lisa Mecca Davis
Lisa Mecca Davis