**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THERESE BURKE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-9232 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| AMEDISYS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Therese Burke worked as the Vice President of Operations for a home health care company, Defendant Amedisys, from 2013 until 2017. Before Burke came on board, Amedisys paid $150 million to settle lawsuits that the company had overbilled Medicare in violation of the False Claims Act. As Burke tells is, the more things changed, the more they stayed the same.

Burke alleges that the company implemented new quotas for home health care patients. The targets were so high that employees could not hit them without submitting fraudulent Medicare claims. The quotas for medical care outpaced the actual need for medical care. But Amedisys kept a singular focus on hitting the numbers, by any means necessary.

Burke began to speak up about Amedisys's practices. She voiced her concerns to her manager, but the concerns fell on deaf ears. She encountered nothing but resistance. Burke then refused to participate in a process geared toward overbilling. She declined to fire a subordinate who wasn't hitting her numbers, because the subordinate explained that she was providing only the medical care that was necessary. So Amedisys fired Burke.

Burke later filed this lawsuit, bringing a retaliation claim under the False Claims Act. She alleged that Amedisys fired her for speaking up about Amedisys's practices and refusing to terminate an employee who was playing it straight.

Amedisys, in turn, moved to dismiss. For the reasons explained below, the motion is denied.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

The case is about whether Amedisys retaliated against Burke for raising concerns about the company's practices when billing Medicare for home health coverage. The Court will begin with a short overview of the Medicare Home Health Benefit program, and then will dive into the allegations about Burke's experiences at Amedisys.

## I. Medicare Home Health Coverage

Medicare provides health insurance for eligible citizens. *See* Second Am. Cplt., at ¶ 8 (Dckt. No. 33). Coverage includes reimbursement for home health care services through the Medicare Home Health Benefit program. *Id.* at ¶ 9. To qualify, a patient must (1) be homebound, (2) need part-time skilled nursing services, speech therapy, physical therapy, or continuing occupational therapy as determined by a physician, and (3) be under a plan of care established and reviewed by a physician and administered by a qualified home health agency. *Id.* If a patient qualifies, Medicare will pay for a variety of services, including part-time skilled

nursing care, therapy, counseling, part-time home health care, and medical equipment and supplies. *Id.* at ¶ 10.

As the name suggests, home health agencies provide home health care to eligible patients, and then bill Medicare for their services. *Id.* at ¶ 11. Before billing Medicare, home health agencies must independently assess and verify whether a patient qualifies for the program. *Id.* They must assess the patient and verify the need for care.

Typically, a home health agency completes this assessment and verification at an initial assessment with the patient. *Id.* at ¶ 15. After a physician's referral, a registered nurse with a home health agency makes an initial assessment visit to assess the patient's clinical, functional, and service characteristics. *Id.* These characteristics include the patient's observable medical condition, physical capabilities, and expected therapeutic needs. *Id.* The nurse also evaluates the patient's eligibility for Medicare home health care – including homebound status. *Id.*

Based on the initial assessment, the home health agency determines the patient's "case mix assignment" and assigns the patient to one of eight Home Health Resource Groups, depending on the patient's care needs. *Id.* This assignment is then coded as a Health Insurance Prospective Payment System code, which Medicare uses to determine the rate of payment for a given patient. *Id.*

Medicare pays for home health care on 60-day cycles through the Prospective Payment System. *Id.* So, to continue receiving care after the first 60 days, the patient must be re-certified with a new comprehensive assessment within the final five days of the cycle. *Id.* at ¶ 16. In addition to regular assessments, the home health agency must maintain clinical notes documenting the patient's condition, homebound status, and receipt of services. *Id.*

3

## II.     Amedisys and Home Health Care Fraud

Unfortunately, the Medicare home health benefit is no stranger to fraud.  *Id.* at ¶ 17.  And Amedisys is no stranger to allegations of fraud, either.

Amedisys is home health and hospice service corporation based in Baton Rouge, Louisiana.  *Id.* at ¶ 3  The company operates in 45 states and Puerto Rico.  *Id.*  But analysts and whistleblowers have singled out Amedisys for using methods of record-keeping and billing, including a proprietary software, as a "secret sauce" to squeeze an artificially high profit margin from Medicare.  *Id.* at ¶ 23.

In 2014, whistleblowers brought seven *qui tam* lawsuits on behalf of the United States, accusing Amedisys of submitting false claims to Medicare in violation of the False Claims Act. *Id.* at ¶¶ 3, 19; *see also United States ex rel. CAF Partners et al. v. Amedisys, Inc.*, No. 10-cv-2323 (E.D. Pa.); *United States ex rel. Brown v. Amedisys, Inc.*, No. 13-cv-2803 (E.D. Pa.); *United States ex rel. Umberhandt v. Amedisys, Inc.*, No. 13-cv-2789 (E.D. Pa.); *United States ex rel. Doe v. Amedisys, Inc.*, No. 13-cv-3187 (E.D. Pa.); *United States ex rel. Ognen v. Amedisys, Inc.*, No. 13-cv-4232 (E.D. Pa.); *United States ex rel. Lewis v. Amedisys, Inc.*, No. 13-cv-3359 (E.D. Pa.); *United States ex rel. Raven v. Amedisys, Inc.*, No. 11-cv-0994 (N.D. Ga.).  Amedisys eventually resolved those suits through a $150 million settlement.  *See* Second Am. Cplt., at ¶¶ 3, 19 (Dckt. No. 33); *see also Amedisys Home Health Companies Agree to Pay $150 Million to Resolve False Claims Act Allegations*, Department of Justice, https://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations (last visited August 10, 2022).  As part of the settlement agreement, Amedisys entered into a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services.  *See* Second Am. Cplt., at ¶ 19.

The Corporate Integrity Agreement imposed certain compliance obligations on Amedisys for five years (from 2014 until 2019). *Id.* Some of those obligations involved what to do if Medicare overpaid. *Id.* at ¶¶ 19–20. Under the Agreement, Amedisys had a duty to notify the Office of the Inspector General if it became aware of a substantial overpayment. *Id.* at ¶ 20. Amedisys needed to repay any overpayment within 60 days of identification and take further remedial steps to correct the problem within 90 days. *Id.* at ¶ 19. Additionally, Amedisys had to submit an annual report that summarized all reported events and overpayments. *Id.* at ¶ 20. The report needed to include a certification that the company had complied with its obligations.

According to Therese Burke, Amedisys did not comply with the settlement agreement. Instead, Burke alleges that Amedisys continued to defraud the United States after 2014 by submitting false claims to Medicare.

## III. Burke's Allegations of Fraud

Therese Burke has worked in the health care industry for over 20 years. *Id.* at ¶ 5. In 2013, Amedisys hired Burke as Area Vice President of Operations for Illinois, Wisconsin, and Indiana. *Id.* She quickly was promoted. In 2014, Amedisys promoted Burke to General Manager of the area. *Id.* at ¶ 55. In that role, she oversaw the sales, operations, and clinical divisions. *Id.*

Burke performed well. She won the "Most Improved Pod" and received an award from Amedisys's Vice President of Operations. *Id.* Amedisys also asked Burke to train new Area Vice Presidents and travel to poorly performing areas as a trouble-shooter. *Id.*

Soon after Burke came on board, Amedisys started running into issues. After the 2014 settlement, Amedisys's growth stagnated. *Id.* at ¶ 26. In the spring of 2015, Amedisys CEO Paul Kusserow informed management – including Burke – that "there 'may only be five years of

5

non-managed Medicare remaining' and that the company should 'get what it could now.'" *Id.*

Burke interpreted this statement to mean that Amedisys thought that "the Medicare home health

gravy train might be pulling into the station permanently in the near future," and that the

company needed new strategies to boost profits. *Id.*

In early 2016, Amedisys announced a "major shakeup" at the executive level. *Id.* at ¶ 27.

It replaced much of its senior management team, including its General Counsel, Chief Medical

Officer, Chief Financial Officer, Chief Information Officer, Chief Strategy Officer, and Chief

Operating Officer. *Id.* Soon after, Amedisys reported that its Chief Compliance Officer was

taking 12 months of paid leave. *Id.* But he never returned. *Id.* Burke's colleagues and

supervisors told her that the Chief Compliance Officer was terminated because "compliance had

swung too far the other way and was inhibiting growth." *Id.*

Amedisys also restructured Burke's position. *Id.* at ¶ 56. She became the Area Vice

President of Operations, directly reporting to the Vice President of Operations, Melissa Adams.

*Id.* Kit Hughes became the Vice President of Clinical. *Id.*

In mid-2016, management started rolling out plans to cut costs and boost profit by any

means necessary. *Id.* at ¶ 30. It eliminated Quality Care Coordinators – Amedisys employees

who reviewed initial assessments to make sure that the company was not fraudulently upcoding

patients' needs. *Id.* at ¶ 29. And Amedisys aggressively focused on monitoring and mandating

the number of nursing and therapy visits performed in a 60-day cycle. *Id.* at ¶ 30.

The company limited expensive, unprofitable nursing visits, while requiring more

profitable therapy visits regardless of patient need. *Id.* Burke's supervisors told her that the

company wanted patients to have five skilled nursing visits and 14–17 therapy visits, for a total

of 19–22 visits per 60-day cycle. *Id.* at ¶ 32. After that point, reimbursement for further visits

did not outweigh the costs, so management prohibited them. *Id.* In fact, if a patient needed more than 24 visits in a 60-day cycle, employees had to get special authorization. *Id.*

To enforce that plan, Amedisys rolled out a system for tracking nursing and therapy visits through a new software called Homecare Homebase. *Id.* at ¶¶ 33, 35. The software allowed Amedisys management to keep tabs on these metrics to make sure that they stayed within the desired range. *Id.* at ¶¶ 33, 36. Amedisys set weekly – and sometimes even daily – performance goals and quotas for nursing and therapy visits. *Id.* at ¶ 36. Area Vice Presidents received weekly "therapy scorecards" with quotas for the number of each type of visit. *Id.* at ¶ 40. Burke and her colleagues had to monitor the scorecards and run Medicare Home Heath Utilization Analysis Reports, which placed an area's therapy utilization in context of cost and gross margin. *Id.* ¶ 40.

Amedisys management discussed these metrics and quotas at regular Clinical Effective Initiative calls. *Id.* at ¶¶ 34, 36. Adams (Burke's supervisor) informed Burke that the purpose of the Clinical Effective Initiative calls was to "let you feel the heat we feel [from corporate leadership]." *Id.* at ¶ 34.

During the Clinical Effective Initiative calls, Amedisys's Chief Operating Officer excoriated Area Vice Presidents who failed to meet the metrics. *Id.* at ¶ 36. When individual care centers failed to meet quotas, the Area Vice President in charge of that center had to attend additional "naughty calls" where company leadership emphasized quota performance. *Id.*

When goals and quotas were not met, Amedisys management told Burke to "dig deeper." *Id.* at ¶ 40. Burke felt like senior leadership used any means necessary to force mid-level management – like herself – to meet the quotas to maximize profitability. *Id.* at ¶ 38.

"By demanding that goals be met in every location at all times and savagely berating, threatening and terminating managers who raised concerns or whose agency or area failed to comply, Amedisys corporate leadership intentionally and successfully conveyed the message that these quotas simply had to be maintained, regardless of actual patient care needs, clinical propriety, or qualification for the Medicare Home Health Benefit." *Id.* at ¶ 6.

In 2017, measures to increase profitability escalated. Amedisys hired Chris Gerrard, a home health industry insider, as the new Chief Operating Officer. *Id.* at ¶ 41. Gerrard and his second-in-command, Amedisys's Home Health Division President Teonie Aurelio, placed even greater emphasis on quotas for recertification for further benefit periods, meaning providing care to patients after the initial 60-day period. *Id.* at ¶ 41. Recall, Medicare pays for home health care on 60-day cycles. But to receive benefits after the first cycle, a patient must be recertified. Aurelio even described recertifications as "'the lowest hanging fruit.'" *Id.* at ¶ 41.

In March 2017, Gerrard and Aurelio held a meeting for the Area Vice Presidents in San Francisco. *Id.* at ¶ 42. Gerrard hammered the importance of recertification quotas and humiliated any manager whose area or region fell short. *Id.* The meeting left many Area Vice Presidents and Regional Vice Presidents in tears. *Id.*

At the meeting, Gerrard and Aurelio "made clear that 'recert' quotas were to be met or managers would be fired and replaced by others who could achieve those goals." *Id.* at ¶ 43. Gerrard suggested different methods that Area Vice Presidents like Burke could use, depending on if a patient had "too many" therapy visits or "too few."

If a patient had "too many" therapy visits in one 60-day cycle, Gerrard proposed telling clinicians that patients might be fatigued by multiple visits per week. *Id.* at ¶ 44. He said that the company should suggest spreading the visits over multiple 60-day cycles. *Id.* That way,

8

Amedisys could get the patient recertified and bill for two 60-day cycles instead of one. *Id.* If a patient had "too few" therapy visits, Gerrard suggested re-educating clinicians on the benefits of Amedisys's therapy visits regardless of patient need. *Id.* at ¶ 45.

According to Burke, Amedisys's proposals were like fitting a square peg into a round hole. *Id.* at ¶ 49. After all, the quotas were not tied to individual patient need. *Id.* And Burke alleges that the only way to meet the quotas was to disregard Medicare's home health eligibility requirements and recertify patients anyway. *Id.* Many agency-level managers told Burke that it was impractical or even impossible to meet Amedisys's requirements. *Id.*

As Amedisys began implementing the new goals and quotas, Burke became increasingly concerned. She believed that the "corporate policy was designed to result in false claims for clinically unnecessary therapy." *Id.* at ¶ 48. And she started speaking up.

Burke "repeatedly communicated to corporate leadership that she was concerned that these practices were not in compliance with Medicare regulations." *Id.* at ¶ 7. Starting in mid-2016, Burke "discussed the impropriety of the[] tactics with VP Adams." *Id.* at ¶ 58. She "informed Ms. Adams that the Medicare quotas and incredibly short time-frames to achieve such quotas set by Amedisys were impossible to achieve legitimately and therefore could only be achieved through defrauding the Medicare program, thus what Amedisys was requiring was 'illegal.'" *Id.*

But when Burke shared her perspective, "Adams ignored her and responded 'don't say that, don't say that to me.' Further, Adams told Ms. Burke that, while she agreed that it was 'impossible' to manage these numbers in the way Amedisys was demanding, Adams 'needed the job' and therefore Adams recommended that she and Burke just 'shut up and do what they say.'" *Id.*

9

Later in 2016, Burke shared her concerns with Hughes (again, the Vice President of Clinical). *Id.* at ¶ 59. Hughes "agreed with Ms. Burke, telling her that she found the practice [of mandating recertification levels] 'ridiculous and unethical' and had never seen it employed in all her experience in home health." *Id.* But when Burke told Adams about her conversation with Hughes, Adams told "Burke to ignore VP Hughes, who was out of favor with senior leadership and could soon be terminated herself." *Id.*

Around that time, another Area Vice President of Operations, Tina Coats, started speaking out about Amedisys's quotas and policies regarding Medicare patients. *Id.* at ¶ 60. Burke shared with Adams what Coats had said. It didn't land well. Adams warned Burke to stop repeating what Coats had said and stay out of it if she wanted to keep her job. *Id.* at ¶ 61. Amedisys later fired Coats in January 2017. *Id.*

Despite her concerns, Burke remained a top employee. *Id.* at ¶ 62. But not for long.

In March 2017, Adams told Burke that the Lake Zurich, Illinois care center – which was under Burke's supervision – was underperforming. *Id.* at ¶ 67. Adams warned Burke that if it did not start hitting its recertification numbers, Burke would be fired. *Id.* At the time, the Lake Zurich center was 35% short of Amedisys's recertification goals. *Id.*

The Lake Zurich center largely had high-functioning patients who were referred from an assisted living facility. *Id.* at ¶ 68. When Burke asked the Lake Zurich Director, Ania Claude, why they were not meeting their recertification numbers, Claude responded that the patients weren't sick enough for more care. *Id.* at ¶ 69. Claude explained that they recertified the patients when appropriate, and that Amedisys's quotas could not be met without false recertifications. *Id.* at ¶ 70.

Burke shared this explanation with Adams, and it landed like a lead balloon. Adams was not pleased. She instructed Burke to hit the numbers "now." *Id.* And she directed Burke to fire Claude and install someone who could hit Amedisys's goals. *Id.* at ¶ 73.

But Burke didn't fire Claude. She "refused to personally participate in Amedisys'[s] fraud" and told Claude to "do what's right." *Id.* at ¶¶ 75–76. So, the Lake Zurich center did not meet Amedisys's Medicare recertification quotas in March and April 2017. *Id.* at ¶ 75.

"Burke knew that, like Tina Coats a few months prior, her termination was likely forthcoming because she had not only discussed concerns about Amedisys'[s] practices with other managers despite warnings not to do so, but now Ms. Burke had refused to personally participate in Amedisys'[s] fraud." *Id.* at ¶ 76.

Just as Burke feared, Amedisys, through Adams, terminated her on April 25, 2017. *Id.* at ¶ 77. She spoke up, and then was shown the door.

According to Burke, Amedisys did not follow its termination policy. *Id.* at ¶ 78. Burke had terminated several employees during her tenure, and knew that corporate policy required the company to give a terminated employee a document with the reason for termination and a chance to appeal. *Id.* But Burke did not receive any documentation. *Id.* When Burke asked why she was getting fired, Adams responded that she didn't need a reason. *Id.* Burke then asked about the termination policy, but Adams said, "we don't have to do that [meaning follow the policy] at your level." *Id.* at ¶ 79.

After her termination, Amedisys (through Adams) told Burke's counterparts that Burke voluntarily left. *Id.* at ¶ 80.

Burke tried to get another job in the home health care industry. *Id.* at ¶ 81. She interviewed with another company, Kindred at Home. *Id.* She even flew to Nashville for an in-

person interview, and a recruiter unofficially informed her that Kindred planned to hire her. *Id.* at ¶ 82. Burke was about to travel to Florida, where the position was located, when she found out that she didn't get the job after all. *Id.*

Burke asked the recruiter why Kindred changed course. *Id.* at ¶ 83. The recruiter explained that they had called Amedisys. *Id.* As Burke sees it, this response confirmed that Amedisys had communicated negative information to Kindred. *Id.*

In response, Burke filed this *qui tam* lawsuit. *See* Cplt. (Dckt. No. 1). She later filed an amended complaint, advancing six claims. *See* Am. Cplt. (Dckt. No. 13). After the United States declined intervention in 2021, Burke filed an amended complaint that dropped five of the six claims. *See* Second Am. Cplt. (Dckt. No. 33).

Only one count remains. Burke claims that Amedisys violated the False Claims Act by retaliating against her for speaking up and refusing to participate in violations of the Act. *Id.* at ¶ 87.

Amedisys, in turn, moves to dismiss. *See* Def.'s Mtn. to Dismiss (Dckt. No. 37).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the

12

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"In our system of notice pleading, complaints need only plead facts sufficient to put defendants on notice of the claims against them." *R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 942 (7th Cir. 2020). "[T]he federal courts require notice pleading, not fact pleading complete with all the minutiae. A complaint need only provide notice of a plausible claim; there is no rule requiring parties to plead legal theories or elements of a case." *Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 675 (7th Cir. 2019).

A plaintiff need not plead "detailed factual allegations," but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *See Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and quotation marks omitted).

### Analysis

"The False Claims Act is the government's 'primary litigative tool for combatting fraud against the federal government.'" *See United States ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1111 (N.D. Ill. 2018) (quoting *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745 (9th Cir. 1993)). The Act allows the Attorney General and private citizens to file suit for damages against any person who presents "false or fraudulent claim[s] for payment or approval" to the United States. *See* 31 U.S.C. § 3729(a).

The Act also protects employees who blow the whistle on an employer's fraud. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). The statute authorizes employees to bring a claim against employers who retaliate against them for speaking up. "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee,

contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." *See* 31 U.S.C. § 3730(h)(1).

Burke brings a retaliation claim under the False Claims Act. *See* Second Am. Cplt., at ¶ 87 (Dckt. No. 33). A retaliation claim requires a showing that: (1) Burke took protected action "in furtherance of an action" under the False Claims Act or made other efforts "to stop 1 or more [False Claims Act] violations," (2) Amedisys knew about the protected conduct, and (3) Amedisys took adverse action against her "because of" that conduct. *See* 31 U.S.C. § 3730(h)(1); *see also Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012); *United States ex rel. Uhlig v. Fluor Corp.*, 839 F.3d 628, 635 (7th Cir. 2016).

Amedisys argues that the complaint fails to state a claim, and takes aim at all three elements. Amedisys missed the target three times.

## I.     Protected Conduct

The first question is whether the complaint alleges that Burke engaged in protected conduct. The complaint easily clears that hurdle.

The False Claims Act's anti-retaliation provision protects two types of conduct. *See Halasa*, 690 F.3d at 847. First, the Act prohibits employers from terminating employees "in furtherance of an action under this section." *See* 31 U.S.C. § 3730(h)(1). In other words, an employer cannot fire or otherwise mistreat an employee for "conduct that put an employer 'on notice of potential [False Claims Act] litigation.'" *See Halasa*, 690 F.3d at 847 (quoting *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 945 (7th Cir. 2002)). Second, the

Act prohibits employers from taking adverse action against employees "for undertaking 'other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors." *Id.* at 847–48 (quoting 31 U.S.C. § 3730(h)(1)).

To fall under the statute, "an employee need not have actual knowledge" of the False Claims Act. *See Fanslow*, 384 F.3d at 479. The Act does not require knowledge of the Act itself. Instead, the question is whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id.* at 480 (collecting cases). So the question is both subjective (*i.e.*, tied to "the employee") and objective (*i.e.*, tied to "a reasonable employee").

Here, Burke argues that she engaged in two types of protected conduct.

First, she argues that she reported suspected misconduct to her supervisors. *See* Pl.'s Resp., at 6 (Dckt. No. 43). When it comes to protected activity, speaking up about misconduct is right down Main Street. As the Seventh Circuit has explained, the Act covers "reporting suspected misconduct to internal supervisors." *See Halasa*, 690 F.3d at 847–48.

Here, the complaint alleges that Burke spoke up and expressed her concerns about impossible targets and possible fraud. Burke alleges that employees could meet Amedisys's quotas only through fraud, and that she voiced her concerns about fraud to her supervisors on multiple occasions. *See* Second Am. Cplt., at ¶¶ 58–59, 61, 64 (Dckt. No. 33).

In July 2016, Burke told Adams, her direct supervisor, that the "Medicare quotas and incredibly short time-frames to achieve such quotas set by Amedisys were impossible to achieve legitimately and therefore could only be achieved through defrauding the Medicare program." *Id.* at ¶ 58. Later in 2016, Burke told Adams that another outspoken Amedisys employee was right "in that Amedisys was defrauding the Medicare program and [the Center for Medicare and

Medicaid Services] should be alerted." *Id.* at ¶ 61. Burke also told Adams that "she believed that the pressure to achieve the aggressive Medicare recertification targets was inappropriate and would result in Medicare fraud." *Id.* at ¶ 64.

She also talked to another supervisor, Kit Hughes (the Vice President of Clinical), about the "illegality and impropriety of Amedisys setting quotas and budgeting for Medicare recertifications." *Id.* at ¶ 59. Burke "was concerned that mandating Medicare patient recertification levels was, in practice, a requirement that patients be recertified as requiring and qualifying for the Medicare Home Health benefit regardless of medical necessity." *Id.*

And, according to Burke, she wasn't the only employee with concerns. Another Area Vice President of Operations "informed Ms. Burke, and other managers at Amedisys, that she believed Amedisys'[s] pressure to direct clinical decision making regarding Medicare patients was fraud and [the Center for Medicare and Medicaid Services] should be alerted." *Id.* at ¶ 60. A physical therapist that Burke supervised asked her: "Do you want me to recertify patients even if I think the patient is not appropriate?" *Id.* at ¶ 66. And the Lake Zurich director and other staff insisted that they could not meet recertification numbers without fraud. *Id.* at ¶ 70.

At this early stage, the complaint sufficiently alleges that Burke believed in good faith that Amedisys was committing fraud. Burke observed Amedisys implementing aggressive recertification quotas. She raised her concerns time and again. And she wasn't the only Amedisys employee who thought the company was fraudulently billing. Those allegations are more than enough to allege a subjective belief of possible wrongdoing.

From an objective standpoint, Burke plausibly alleged that a reasonable employee in her situation might have believed that Amedisys was committing fraud. For starters, Burke wasn't a lone wolf. Other employees had concerns too. Burke alleged that other Amedisys employees

16

believed that Amedisys submitted fraudulent claims. *Id.* at ¶¶ 60–61, 74. The existence of concerns by other employees supports the notion that concerns were reasonable.

The reaction of her supervisor (Adams) didn't exactly inspire confidence when it came to sniffing out fraud, either. When Burke raised her concerns, Adams basically ignored her, and then responded with "don't say that, don't say that to me" and "shut up and do what they say." *Id.* at ¶ 58. Adams also told Burke time and time again that she would lose her job if she did not meet recertification numbers. *Id.* at ¶ 64 ("VP Adams made clear: '[recert rates] are Teonie's [Aurelio's] big thing and this is what we need to do to keep our jobs.'"); *see also id.* at ¶ 58 ("Adams conveyed to Ms. Burke that, unless she wanted to be fired, she would have to find a way to produce results – which could only be obtained through the submission of false claims."). Amedisys even fired other employees who did not meet the recertification quotas or raised concerns about the quotas. *Id.* at ¶ 60. Burke "saw Adams' threat materialize as other regional and area managers were fired for resisting Amedisys'[s] fraudulent and unrelenting push to direct clinical decision making."). *Id.*

Burke knew about Amedisys's focus on quotas. She believed that the targets were unhittable without committing fraud, and other employees shared similar concerns. She knew that the company fired employees who failed to meet quotas or raised concerns. And she knew that concerns to supervisors fell on deaf ears. All in all, a reasonable employee could believe that the Amedisys submitted false recertifications to meet its quotas.

Second, Burke argues that she engaged in protected conduct when she refused to fire the Lake Zurich director, Ania Claude. *See* Pl.'s Resp., at 6 (Dckt. No. 43). The complaint alleges that in March 2017, "Adams ordered Ms. Burke to fire Ms. Claude and install someone who would accomplish Amedisys'[s] fraudulent goals. In other words, Adams ordered Ms. Burke to

fire a director who was appropriately caring for patients and appoint one who would see that Medicare patients were falsely recertified so that false claims could be submitted to Medicare." *See* Second Am. Cplt., at ¶ 73 (Dckt. No. 33).

Burke spoke with the Lake Zurich director and other staff, who believed that they could not reach Amedisys's quotas without false certifications. *Id.* at ¶ 70. Burke shared that reaction with Adams and tried to "develop a strategy to broaden the program's referral base." *Id.* But Adams responded that "'that's fine for the future, but you need to hit the numbers now.'" *Id.*

Those allegations pass muster. The complaint alleges that Burke believed that Amedisys was committing fraud in connection with Lake Zurich. And it includes enough details to support an inference that a reasonable employee in her shoes would believe the same. Burke interacted directly with the Lake Zurich staff who informed her that they were recertifying all eligible patients. When she tried to come up with a sustainable strategical solution, her supervisor told her to fire the Lake Zurich director, install someone new, and "hit the numbers now." *Id.*

To be clear, sales pressure does not *have* to mean pressure to commit illegal acts. Sometimes supervisors set high – even *unrealistically* high – targets for their staff. Setting high targets, in and of itself, may not be enough to create an inference that the company encouraged fraud. But here, reading the complaint as a whole, the pleading includes enough facts to support the plausible inference that the company encouraged fraudulent billing practices.

At this early stage, the complaint plausibly alleges that Amedisys was committing or soon would commit fraud at the Lake Zurich center, and Burke tried to stop that fraud by refusing to fire Claude. *See Roche Diagnostics*, 318 F. Supp. 3d at 1115 (explaining that allegations about a relator's efforts to stop a proposed fraudulent transaction sufficiently pled that the relator made efforts to stop an FCA violation).

18

Amedisys makes two arguments why, in its view, a reasonable employee could not have believed that it was committing fraud. They don't get Amedisys very far.

First, Amedisys argues that Burke failed to connect her conduct with a fraudulent claim, meaning the submission of a fraudulent request for payment from Medicare *See* Def.'s Mem., at 5 (Dckt. No. 38); Def.'s Reply, at 4 (Dckt. No. 44). Amedisys argues that "Burke certainly does not allege with any specificity that Amedisys engaged in fraud with respect to any particular patient or even any group of patients. Nor does she ever identify an improper billing practice or the submission of a false claim to the government." *See* Def.'s Reply, at 4.

Amedisys demands too much. Burke alleged that Amedisys directly billed Medicare for its services. *See* Second Am. Cplt., at ¶¶ 15–16 (Dckt. No. 33). She alleged that the company put inordinate pressure on employees to hit impossible targets. The targets were so high that the company couldn't reach them without fraud. Burke alleged that she believed that Amedisys was submitting fraudulent claims or would be submitting fraudulent claims to meet those quotas. *Id.* at ¶¶ 58–66.

Burke also made specific allegations about the Lake Zurich center. She alleged that Adams instructed her to make sure that Lake Zurich hit its numbers. *Id.* at ¶ 67. But when Burke tried to suggest a strategy to broaden the center's referral base, "Adams responded that 'that's fine for the future, but you need to hit the numbers now.'" *Id.* at ¶ 70. Adams even instructed Burke to fire the Lake Zurich director and replace her with someone that would meet Amedisys's goals. *Id.* at ¶ 72.

It is true that the complaint does not include patient-specific allegations. But the Act does not require that level of granularity, and neither do the Federal Rules. A plaintiff can state a claim without alleging that an employer submitted a fraudulent claim for Bob the Patient. If

anything, an allegation that an employer engaged in a fraudulent practice in general seems stronger than an allegation that the company submitted fraudulent claims for Patients X, Y, and Z.

Second, Amedisys argues that the complaint fails to account for the role of independent physicians. *See* Def.'s Reply, at 9–10 (Dckt. No. 44). Recall, to receive home health care benefits, a physician must certify that a patient qualifies and refer the patient to a home health agency for an assessment. *See* Second Am. Cplt., at ¶¶ 13, 15 (Dckt. No. 33). The home health agency must also independently assess and verify that a patient qualifies for the Medicare Home Health Benefit. *Id.* at ¶ 11. That certification must be repeated every 60 days. *Id.* at ¶ 16.

According to Amedisys, no reasonable employee could believe that Amedisys submitted fraudulent claims because a physician also needed to certify that the patient needed home health services. *See* Def.'s Reply, at 10 (Dckt. No. 10). Amedisys points out that Burke fails to make any allegations about the physicians. *Id.* She does not allege that the physicians' certifications were false. *Id.* And she doesn't allege that Amedisys bribed the physicians or otherwise compromised their medical judgment. *Id.*

Once again, Amedisys demands too much. An employee who suspects fraud does not have to figure out all of the gory details. An employee doesn't need to know the ins-and-outs of the fraud. Maybe Burke didn't know how the company got physicians to certify the continuation of care if it wasn't necessary. But she didn't need to know the full story to tell a tale of fraud.

The complaint includes plenty of allegations that the company's practices led to unnecessary medical care. *See, e.g.*, Second Am. Cplt., at ¶ 6 (Dckt. 33) (alleging that the "quotas simply had to be maintained, regardless of actual patient care needs"); *id.* at ¶ 32 ("Amedisys'[s] payment claims to Medicare were based not on legitimate clinical decisions and

20

patient characteristics, but were dictated entirely by Amedisys'[s] profit goals."); *id.* at ¶ 39 ("Not only did Amedisys'[s] corporate strategies result in the admission of patients who did not qualify for home health care under the Medicare program, they also resulted in the provision of unnecessary therapy services performed solely to boost Amedisys'[s] reimbursement."); *id.* at ¶ 46 ("Once again, Amedisys'[s] care decisions were dictated not by medical necessity, but by economic greed."); *id.* at ¶ 48 ("Amedisys'[s] corporate policy was designed to result in false claims for clinically unnecessary therapy."); *id.* at ¶ 49 ("Burke directly observed how corporate pressure forced and continues to force Amedisys'[s] Directors of Operations, Clinical Managers and, in turn, field clinicians, to admit and retain patients who are clearly not homebound or have chronic conditions which do not require skilled nursing or therapy intervention."); *id.* at ¶ 53 (alleging "unnecessary services and unnecessary episodes of care"); *id.* at ¶ 57 (alleging that the company was "billing for home health services that were . . . unnecessary and improper"); *id.* at ¶ 59 ("Burke was concerned that mandating Medicare patient recertification levels was, in practice, a requirement that patients be recertified as requiring and qualifying for the Medicare Home Health benefit regardless of medical necessity.").

The complaint alleges that a physical therapist asked her, "Do you want me to recertify patients even if I think the patient is not appropriate?" *See* Second Am. Cplt., at ¶ 66 (Dckt. 33). The Lake Zurich director stated that "the patients don't want to be recerted, they don't want to have to continue to be homebound, they want to go out to bingo, they want to go to the casino." *Id.* at ¶ 69. The Lake Zurich director "insisted that patients were being recertified when appropriate and that Amedisys'[s] quotas could not be met without false recertifications." *Id.* at ¶ 70.

Yet Amedisys instructed Burke to fire the Lake Zurich director and install someone who could meet Amedisys's quotas. *Id.* at ¶ 73. That episode suggests that the company demanded medical care even when it wasn't medically necessary. Drawing inferences in Burke's favor, the complaint suggests that Amedisys wanted certifications for patients – medical need, or not.

Viewed as a whole at this early stage, the complaint sufficiently alleges that Burke engaged in protected conduct. Burke alleged that she thought that Amedisys was encouraging false recertifications to meet quotas. And she reported her concerns to her supervisor. "Reports to supervisors are a natural first step to stopping fraudulent activity and, depending on the employee's position and the employer's response, may be the only activity they can engage in before filing their lawsuit." *See Klee v. McHenry Cnty. Coll.*, 2017 WL 3168973, at *2 (N.D. Ill. 2017); *see also United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 828 (N.D. Ill. 2015) (holding that reports to a supervisor were sufficient to state a claim of protected conduct). Burke also refused to replace the Lake Zurich director with an employee "who would see that Medicare patients were falsely recertified so that false claims could be submitted to Medicare." *See* Second Am. Cplt., at ¶ 73 (Dckt. No. 33). By reporting her concerns to Adams, and refusing to replace the Lake Zurich director, Burke allegedly engaged in protected conduct. *See Halasa*, 690 F.3d at 847–48.

Overall, the complaint easily clears the hurdle of alleging protected activity. The complaint alleges that Burke expressed concerns that the targets were unreachable without fraud. And she refused to take action against a fellow employee who provided necessary care (and not unnecessary care). The complaint alleges protected activity, in spades.

## II. Knowledge

Second, Burke must allege that Amedisys knew about her protected conduct. The complaint clears that hurdle, too.

The Seventh Circuit in *Halasa* emphasized that "it is the decisionmakers' knowledge that is crucial." *See Halasa*, 690 F.3d at 848. There, the Court of Appeals concluded that Halasa's internal supervisors had knowledge based on his internal report of potential violations. *Id.* But the Court of Appeals found that the ultimate decisionmakers – meaning the people who terminated Halasa – lacked knowledge because Halasa did not make his report to them. *Id.*

Here, Burke reported her concerns about potential fraud to Adams, her direct supervisor. *See* Second Am. Cplt., at ¶ 58 (Dckt. No. 33). And Adams fired Burke. *Id.* at ¶ 77. So, Burke has sufficiently alleged that Adams (*i.e.*, the decisionmaker) had knowledge of her protected conduct (*i.e.*, her reports of suspected fraud). *See Halasa*, 690 F.3d at 848; *Klee*, 2017 WL 3168973, at *3 (finding that plaintiff's "communications with his superiors were sufficient to put the College on notice of his protected activity"); *see also Carnithan v. Cmty. Health Sys., Inc.*, 2015 WL 9258595, at *4 (S.D. Ill. 2015).

At its core, the complaint alleges that Burke complained to her boss about potential misconduct, and then her boss fired her. That's enough to allege knowledge. The boss knew that she was firing someone who had complained to her.

## III. Causation

Finally, Burke must allege that Amedisys fired her "because of" her protected conduct. *See* 31 U.S.C. § 3730(h)(1). The complaint overcomes that hurdle, too.

The parties disagree about what the statute requires when it comes to causation. That is, they disagree about what it means to retaliate against an employee "because of" a protected activity. *See* Def.'s Mem., at 12 (Dckt. No. 38); Pl.'s Resp., at 11 n.2 (Dckt. No. 43).

In *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469 (7th Cir. 2004), the Seventh Circuit held that causation under the False Claims Act's anti-retaliation provision required proof that the employee's protected conduct was "motivated, at least in part, by the protected conduct." *Id.* at 485. The Seventh Circuit settled on that mixed-motive causation analysis after relying, in part, on Title VII principles. *Id.*

Since then, the ground has shifted when it comes to causation. When construing Title VII and other employment-law statutes, the Supreme Court has clarified that the phrase "because of" requires "but-for causation." The Supreme Court has reached that conclusion in a steady stream of case law. *See, e.g.*, *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020) (Title VII); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (Title VII retaliation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (ADEA).

In recent years, the Seventh Circuit has not revisited the causation standard for retaliation claims under the False Claims Act. And, to be sure, it is not this Court's place to depart from the Seventh Circuit case law, even if it seems inconsistent with later interpretations by the Supreme Court. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("In a hierarchical system, decisions of a superior court are authoritative on inferior courts. Just as the court of appeals must follow decisions of the Supreme Court whether or not we agree with them, so district judges must follow the decisions of this court whether or not they agree.") (citations omitted); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994) ("Ours is a hierarchical judiciary, and judges of inferior courts must carry out decisions they believe

24

mistaken."); *FDIC v. Mahajan*, 2013 WL 3771419, at *2 (N.D. Ill. 2013) ("[Courts do] not have the authority to guess at whether binding circuit court precedent will remain viable. The standard for failing to follow binding precedent is strict; in order to depart from appellate precedent the district court must be 'powerfully convinced' that the higher court would overrule its previous decision 'at the first available opportunity.'") (quoting *Colby v. J.C. Penny Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987)); *see also United States v. Blagojevich*, 612 F.3d 558, 562 (7th Cir. 2010) ("And the Supreme Court often reminds other judges that they must follow all of its decisions, even those that seem incompatible with more recent ones, until the Justices themselves deliver the coup de grâce."). When it comes to updating Seventh Circuit case law, the Seventh Circuit is in the driver's seat.

That said, the Seventh Circuit has acknowledged the issue, and it has signaled a willingness to apply a but-for causation standard to retaliation claims under the False Claims Act. *See Heath v. Indianapolis Fire Dep't*, 889 F.3d 872, 874 (7th Cir. 2018) ("We have not yet revisited *Fanslow* to extend *Nassar*'s Title VII holding to § 3730(h)(1), though the similarity of the two provisions might give us reason to do so in a future case."); *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 564 (7th Cir. 2015) ("Although we have not squarely addressed this issue, the parties agree that under both the FCA and Illinois law plaintiffs must demonstrate 'but for' causation.").

Other Circuits have revisited the issue and concluded that the Act requires but-for causation. *See Lestage v. Coloplast Corp.*, 982 F.3d 37, 41 (1st Cir. 2020); *Nesbitt v. Candler County*, 945 F.3d 1355, 1358–60 (11th Cir. 2020); *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 73 (3d Cir. 2018); *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 176–77 (4th Cir. 2018); *United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 333 (5th Cir.

2017).  And several district courts in this Circuit, including in this District, agree.  *See United States ex rel. Marshall v. Woodward, Inc.*, 85 F. Supp. 3d 973, 985 (N.D. Ill. 2015); *Helfer v. Assoc. Anesthesiologists of Springfield, Ltd.*, 2016 WL 183501, at *5 (C.D. Ill. 2016); *Dobson v. Kewaunee Fabrications, LLC*, 2015 WL 4603284, at *3 n.2 (E.D. Wis. 2015); *but see United States ex rel. Snider v. Ctrs. for Pain Control, Inc.*, 2021 WL 1783314, at *5 (N.D. Ind. 2021) (applying the mixed-motive causation standard).

The text of the False Claims Act's anti-retaliation provision supports a but-for causation standard.  The Act protects employees who suffer retaliation "because of lawful acts."  *See* 31 U.S.C. § 3730(h)(1).  That provision echoes the language in Title VII and in the Age Discrimination in Employment Act.  *See* 42 U.S.C. § 2000e-3(a) (making it unlawful to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing"); 29 U.S.C. § 623(a)(1) (making it unlawful for an employer to discriminate against an employee "because of such individual's age").  And the Supreme Court has interpreted those provisions to require but-for causation.  *See Nassar*, 570 U.S. at 350 (construing Title VII); *Gross*, 557 U.S. at 177 (construing the ADEA).

In decisions under other statutes, the Seventh Circuit has relegated to the backseat any mixed-motive theories of liability.  A plaintiff typically must show but-for causation unless the text of the statute suggests that a lower standard applies, that is, unless the statute authorizes claims when "an improper consideration was 'a motivating factor' for the contested action."  *See Serafinn v. Local 722 International Brotherhood of Teamsters*, 597 F.3d 908, 915 (7th Cir. 2010) (construing the Labor Management Reporting and Disclosure Act); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010) (construing the ADA) ("Although the *Gross*

decision construed the ADEA, the importance that the court attached to the express incorporation of the mixed-motive framework into Title VII suggests that when another anti-discrimination statute lacks comparable language, a mixed-motive claim will not be viable under that statute."); *Fairley v. Andrews*, 578 F.3d 518, 525–26 (7th Cir. 2009) (construing section 1983) ("[U]nless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law.").

Maybe the Seventh Circuit will bring the causation standard under the False Claims Act in line with the recent stream of case law. But in the meantime, it does not make much difference to the complaint at hand. Either way, the complaint alleges enough. The complaint alleges enough facts to support a plausible inference that her decision to speak up was the but-for cause of her termination. So the allegations necessarily satisfy the mixed-motive standard, too.

The complaint alleges that Amedisys terminated Burke because she complained about the company's business practices, and because she refused to terminate the director of the Lake Zurich center. Specifically, the complaint alleges that Burke "refused to fire Ms. Claude," and "[b]y doing so, Ms. Burke knew that, like Tina Coats a few months prior, her termination was likely forthcoming because she had not only discussed concerns about Amedisys'[s] practices with other managers despite warnings not to do so, but now Ms. Burke had refused to personally participate in Amedisys'[s] fraud through her refusal to terminate Ms. Claude." *See* Second Am. Cplt., at ¶ 76 (Dckt. No. 33).

Amedisys argues that it fired Burke for insubordination, not in retaliation for her protected conduct. *See* Def.'s Mem., at 19 (Dckt. No. 38). The Act does not prohibit firing an employee for insubordination. *See Woodward*, 812 F.3d at 565 (affirming the dismissal of a claim under the False Claims Act because "plaintiffs were fired because of insubordination, not

protected activity"). But insubordination must mean something other than whistleblowing, or else the exception would swallow the rule.

*Woodward* is a good example of what insubordination means, and how it differs from protected activity under the False Claims Act. There, employees of a manufacturer of military parts raised concerns about the adequacy of a part used in helicopters. *Id.* at 559–61. They refused to work on the projects involving the part until the company fixed the alleged problem. *Id.* And they told the company that they were going to share their concerns with the Department of Defense. *Id.* The company investigated and determined that the part was acceptable, but the employees wouldn't return to working on the projects, so the company let them go. *Id.*

The district court found no evidence of retaliation, and the Seventh Circuit affirmed. The company terminated the employees "only after investigating their concerns, informing plaintiffs that their concerns were unfounded, and giving plaintiffs multiple opportunities to resume their assigned tasks. Instead, plaintiffs engaged in insubordination by repeatedly refusing to work when faced with overwhelming evidence contradicting their allegations." *Id.* at 565. So the district court "correctly concluded that no reasonable jury could find that plaintiffs were terminated because of protected activity." *Id.*

The allegations in the case at hand are somewhere near the other end of the spectrum. In *Woodward*, the company investigated the allegations by the employees, and found them unsubstantiated, but the employees refused to work anyway.

Here, by contrast, the concerns by Burke received a chillier reception. Adams told Burke to "shut up and do what they say," and to "stay out of it if" if she wanted to "keep her job." *See* Second Am. Cplt., at ¶¶ 58, 61 (Dckt. No. 33). Adams told Burke that the underperforming Lake Zurich center needed to "start 'hitting its numbers,'" or else Burke would be fired. *Id.* at ¶ 67.

28

When it became clear that the Lake Zurich center could not hit its numbers, "Adams ordered Ms. Burke to fire Ms. Claude and install someone who would accomplish Amedisys'[s] fraudulent goals. In other words, Adams ordered Ms. Burke to fire a director who was appropriately caring for patients and appoint one who would see that Medicare patients were falsely recertified so that false claims could be submitted to Medicare." *Id.* at ¶ 73.

Adams did not simply order Burke to fire an underperforming employee. She ordered Burke to fire an employee who "insisted that patients were being recertified when appropriate and that Amedisys'[s] quotas could not be met without false recertifications." *Id.* at ¶ 70. Adams directed Burke to replace the director with someone who would submit false claims. *Id.* at ¶ 73. Instead of dispelling Burke's concerns, Adams intensified them by ignoring Burke's suggestions and ordering her to fire Claude.

Perhaps, after discovery, Burke's claims won't pan out. But for now, Burke tells a plausible story of reporting potential fraud to her supervisor. And in response, she got the cold shoulder, and then an earful, and then was shown the door. When viewed as a whole, the complaint alleges enough facts to support the notion that the company fired her for whistleblowing, not insubordination.

### Conclusion

For the foregoing reasons, the Court denies Defendant Amedisys's motion to dismiss.

Date:  August 10, 2022

_____

Steven C. Seeger
United States District Judge

29